**CARY OIL CO., INC., et al., Plaintiffs,**

v.

**MG REFINING & MARKETING, INC., et al., Defendants.**

**99 Civ. 1725(VM).**

United States District Court, S.D. New York.

Oct. 22, 2002.

Order Denying Reconsideration Oct. 31, 2002.

Richard G. Tashjian, Tashjian & Padian, Jerome K. Walsh, Lane & Mittendorf L.L.P., New York City, for plaintiffs.

Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handler, L.L.P., Jeffrey Barist, Milbank, Tweed, Hadley & McCloy L.L.P., New York City, for defendants.

### *DECISION AND ORDER*

MARRERO, District Judge.

Before the Court is a Report and Recommendation (the "Report") issued by Magistrate Judge Douglas F. Eaton recommending that: (1) the Court grant a motion by defendants Metallgesellschaft Refining and Marketing, Inc. ("MGRM"), Metallgesellschaft Corporation ("MG Corp.") and Metallgesellschaft AG ("MGAG") (collectively the "Defendants") for summary judgment dismissing the

complaint in regard to the claims by plaintiffs Dalton Petroleum, Inc. ("Dalton"), RK Distributing, Inc. ("RK Distributing"), Merritt Oil Company ("Merritt Oil"), and Higginson Oil Company ("Higginson Oil"); and (2) deny the motion for summary judgment by Defendants with respect to the other eleven plaintiffs in this action. For the reasons discussed below, the Court adopts the Report's recommendations. A copy of the Report is attached and incorporated to this Decision and Order.

## I. *FACTUAL BACKGROUND* [1]

Plaintiffs in this case (collectively "Plaintiffs") are fifteen corporations engaged in the business of marketing and/or distributing petroleum products in the United States. Defendants are in the business, among other things, of selling petroleum products. MGAG, a German corporation, is the sole shareholder of MG Corp., a Delaware corporation with offices in New York, which in turn is the sole shareholder of MGRM, a Delaware Corporation that is now defunct and formerly had offices in New York, Texas and Maryland.

In the early 1990s, MGRM sought to attract customers of its petroleum marketing business by offering "innovative risk management programs" that were not being offered by other energy marketers at the time. (MG Corp. Confidential Descriptive Memorandum, December 1993, attached as Ex. 1 to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Dated Nov. 7, 2001 ("Pls.' Opp."), at 3). MGRM offered to help customers hedge the risks associated with volatile price fluctuations in global petroleum prices. Under certain conditions, MGRM offered customers "an option to unwind

their hedges early to take advantage of favorable market movements." (Report by Siegfried Hodapp, President of MG Corp., dated March 2, 1992, attached as Ex. 5 to Pls.' Opp., at 2.) According to MGRM, this program was offered "not only [to] protect[ ] station owners against risk, but also to allow[ ] them to participate in upside profit potential." (*Id.* at 3.)

As a part of this risk management program, MGRM offered its customers three types of long-term petroleum supply contracts in the early 1990s. Each of the fifteen plaintiffs in this action entered into one or more of these contracts with MGRM. Under the first type of contract, termed a "guaranteed margin contract," MGRM supplied a customer with a specified amount of gasoline or diesel fuel with a variable price over a set time period. The other two types of contracts, termed a "ratable" and a "flexie" contract, were fixed-price supply contracts. The ratable contract provided for monthly delivery of a specified volume, apportioned "ratably" over the contract's five-year or ten-year term. The flexie differed from the ratable contract, in that, unlike the ratable's monthly delivery schedule, the flexie contracts allowed customers to schedule delivery flexibly within the contract term.

Both the ratable and the flexie contracts contained a cash "blow-out" option. If, during the contract term, the price of petroleum futures on the New York Mercantile Exchange ("NYMEX") rose higher than the fixed price in the contract, the customer could use this option to cash-out its obligation to take delivery of the petroleum it had contracted to purchase. If a customer chose to exercise this option un-

---

1. This section is based, in part, on the previous Memorandum Opinion issued by Judge Kaplan before the case was reassigned to this Court. *See Cary Oil Co., et al. v. MG Refining and Marketing, et al.,* 90 F.Supp.2d 401

(S.D.N.Y.2000). Although that Opinion was written before the commencement of discovery, its general description of the background in this case is supported by the record.

der a flexie contract, MGRM was to provide it with a cash payment equal to the difference between the NYMEX price and the contract price, multiplied by the number of gallons to be cashed out.

As is readily apparent, the option clauses in the flexie contracts presupposed, not unreasonably, that MGRM would maintain long hedge positions—positions giving it the right to buy the product it was obliged to deliver to its customers at or near the prices at which it was obliged to sell—in order to avoid the risk of literally open-ended losses that otherwise could have been sustained by MGRM if market prices rose above the contract prices. Nevertheless, the flexie contracts did not expressly require MGRM to maintain such hedge positions.

Soon after these contracts went into effect, Defendants began to experience financial difficulty. In order to reduce its exposure under the flexie contracts and others, MGRM had hedged by purchasing oil futures contracts on the NYMEX and off-exchange derivatives. When oil prices dropped sharply in late 1993, MGRM faced huge margin calls and suffered other short-term losses, plunging the entire conglomerate into a severe liquidity crisis and pushing it to the brink of insolvency. At the last minute, MGAG's creditors stepped in and orchestrated a reorganization and bail out. This involved, among other things, financial and managerial restructuring, new lines of credit and liquidation of MGRM's hedge positions in derivatives traded on and off the exchange markets.

Although MGAG survived the crisis, the legal and regulatory fallout has been substantial. In addition to facing numerous law suits, MGRM became the target of a Commodity Futures Trading Commission ("CFTC" or the "Commission") inquiry. Prior to the institution of any enforcement action, MGRM submitted an offer of settlement that was accepted by the Commis-

sion and resulted in the issuance of a consent order. *See MG Refining and Marketing, Inc.,* CFTC Docket No. 95–14, 1995 WL 447455, *2, *6 (July 27, 1995). The uncontested recitals that preceded the decretal portion of the order set forth the Commission's findings that the contracts here at issue were "illegal off-exchange futures contracts." The decretal portion of the order, to which MGRM explicitly agreed, provided in relevant part that MGRM would cease offering the contracts and promptly notify all purchasers of the contracts that the Commission had found the contracts to be "illegal and void." The order thus arguably relieved MGRM of its obligations under the contracts. And that is the heart of Plaintiffs' grievance. They contend that Defendants breached their duties to Plaintiffs by proposing and entering into a settlement with the CFTC for the express purpose of obtaining a statement that the contracts were void in order to avoid their contractual duties and eliminate their exposure to Plaintiffs.

In January and February of 1996, eight of the plaintiffs, including Dalton Petroleum, entered into general release agreements prepared by MGRM. (*See* Cancellation and Release Agreements ("Release Agreements"), attached as Ex. 25 to Defendants' Motion for Summary Judgment, dated October 1, 2001 ("Defs.' Mot.").) Dalton Petroleum's Release Agreement specifically released MGRM from its obligations under its ratable and flexie contracts with Dalton Petroleum. (*Id.*) In contrast, the Release Agreements signed by the other seven plaintiffs specifically released MGRM from its obligations under the ratable contracts, but the Release Agreements did not mention the flexie contracts. (*Id.*)

On reassignment of this case from Judge Lewis A. Kaplan, this Court referred it to Magistrate Judge Eaton for consideration of dispositive motions. De-

fendants filed a motion for summary judgment. On January 4, 2002, Magistrate Judge Eaton issued his Report. Defendants and Plaintiffs each submitted separate objections to the Report, as well as memoranda responding to each other's objections.

In addition, the International Swaps and Derivatives Association ("ISDA"), the Securities Industry Association ("SIA") and the Bond Market Association ("BMA") filed an *amici curiae* memorandum in support of Plaintiffs' Objections to the Magistrate Judge's Report. In an Order dated March 21, 2002, the Court indicated that it would consider the *amici curiae* memorandum on the limited issue of the legislative history and intent of the Commodity Futures Modernization Act of 2000 (the "CFMA"). Defendants filed a response to the *amici curiae* memorandum.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

The Federal Magistrate Act provides that a district judge may "designate a magistrate to conduct hearings, including evidentiary hearings" in order to "submit to a judge of the court proposed findings of fact and recommendations for the disposition" of a motion for summary judgment. 28 U.S.C. § 636(b)(1)(B) (2000). In reviewing the Report, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *see* Fed.R.Civ.P. 72(b). Any party may object to the Magistrate Judge's findings and recommendations. *See id.* If an objection is timely filed, as is the case here, the Court is bound to make a *"de novo* determination of those portions of the report ... or recommendations to which ob-

jection is made." *Id.; see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). Having conducted a careful *de novo* review of the Magistrate Judge's well-reasoned Report, and of the objections by Defendants and Plaintiffs, the Court adopts the recommendations of the Report.

### B. *THE ENFORCEABILITY OF THE FLEXIE CONTRACTS*

The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.,* requires that futures contracts be marketed and entered into only through certain designated "contract markets," which meet very specific CEA requirements. The issue of enforceability arises in this case because section four ("§ 4") of the CEA makes it unlawful for any person

> to offer to enter into, to enter into, to execute, [or] to confirm the execution of ... a contract for the purchase or sale of a commodity for future delivery ... unless ... such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commodity Futures Trading Commission as a 'contract market' for such commodity ....

7 U.S.C. § 6(a)–(a)(1). One of the Defendants' principal arguments for summary judgment is that the flexie contracts, which appear to be "contracts for the purchase or sale of a commodity for future delivery," were never entered into in accordance with the rules that this section specifies. Absent some exception to § 4, the flexie contracts would therefore qualify as unlawful off-exchange futures contracts.

■ In his Report, the Magistrate Judge recommends that the Court grant Defendants' motion for summary judgment against four plaintiffs in this action.[2] With

---

**2.** The Court notes that Plaintiffs do not object to the Magistrate Judge's conclusion that summary judgment should be granted against

Dalton because its President signed a cancellation and release that covered the flexie contract at issue in this case. (*See* Report at 12–

respect to three of these plaintiffs, RK Distributing, Merritt Oil and Higginson Oil, the Magistrate Judge concludes that the record clearly establishes that they entered into the flexie contracts for purely speculative purposes and as result, these contracts violate the CEA and are unenforceable as a matter of law.

Plaintiffs assert that the Magistrate Judge's recommended ruling: (1) incorrectly concludes that the flexie contracts entered into by RK Distributing, Merritt Oil and Higginson Oil were unlawful, off-exchange futures contracts; (2) is inconsistent with Judge Kaplan's decision in *Commodity Futures Trading Comm'n v. Hanover Trading Corp.*, 34 F.Supp.2d 203, 206 (S.D.N.Y.1999) and common law permitting the enforceability of unlawful contracts; and (3) incorrectly found that the contract enforcement provision of the CFMA is not applicable to the flexie contracts in this case. (*See* Plaintiffs' Limited Objections to Magistrate Judge Eaton's January 4, 2002 Report and Recommendation to Judge Marrero Regarding Defendants' Motion for Summary Judgement, dated February 8, 2002 ("Pls.' Obj."), at 1–2.)

### 1. *Were Certain Flexie Contracts Unlawful Off-exchange Contracts?*

To reach his conclusion that the flexie contracts entered into by RK Distributing, Merritt Oil and Higginson Oil were unlawful off-exchange futures contracts and unenforceable as a matter of law, the Magistrate Judge relied on the thorough analysis set out in *MG Refining & Marketing, Inc. v. Knight Enterprises, Inc. et al.*, 25 F.Supp.2d 175, 180–88 (1998) ("*Knight II*"). Although that case is unrelated to the instant case, the underlying facts were similar.

In *Knight II*, eighteen of MGRM's petroleum customers had entered into flexie contracts that were almost identical to the flexie contracts in the instant case. Considering MGRM's motion for summary judgment, the Court quickly rejected plaintiffs' assertion that the flexie contracts could qualify under the "trade option," or the "swaps" exception [3] to the CEA. *See Knight II*, 25 F.Supp.2d at 181. Instead, it focused on whether the flexie contracts at issue qualified for the "forward contract" exception [4] to the CEA. Reviewing caselaw and administrative opinions issued by the CFTC, the Court concluded that the question of whether a

---

13.) Having found that there is no manifest error in this recommendation, the Court grants Defendants' motion for summary judgment with respect to Dalton. *See Counts v. Portuondo*, No. 97 Civ. 3305, 2002 WL 562646, at *1 (S.D.N.Y. Apr. 16, 2002). The Court also notes that plaintiff Wise Oil and Fuel, Inc. ("Wise Oil") has indicated that it will move for leave to amend the complaint with an allegation that it orally entered into a second flexie contract with Defendants. In his Report, the Magistrate Judge recommends that the Court not permit Wise Oil to sue on its alleged second flexie contract. (*See* Report at 20, 48.) While the Court agrees that there is currently no basis to provide Wise Oil with leave to amend, the Court need not make a ruling on this issue because Wise Oil has not made a formal motion to this effect.

3. The "trade option" exception exempts commodity options when the offeror has a "reasonable basis to believe" that it is offering the option to "a producer, processor or commercial user of, or merchant handling, the commodity which is the subject of the commodity option transaction ... and that such producer, processor, or commercial user or merchant is offered or enters into the commodity option transaction solely for purposes related to its business as such." 17 C.F.R. § 32.4(a). The "swaps" exception is not applicable to the instant case.

4. The "forward contract" exception exempts transactions for "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 1a(19).

transaction qualified for the forward contract exception depended on the underlying purpose of the transaction. *See id.* at 184 ("The underlying purpose of a transaction is ... the touchstone of the forward contract analysis."). According to this analysis, transactions that have been entered into for purely speculative purposes do not qualify for the forward contract exception. Although there is no "definitive list" of elements for determining this purpose, "[s]uch an assessment entail[s] ... a review of the 'overall effect' of the transaction as well as a determination of 'what the parties intended.'" *Id.* at 183 (quoting 1990 Statutory Interpretation Concerning Forward Transactions (the "1990 CFTC Statutory Interpretation"), 55 Fed.Reg. 39188, 39191).

The plaintiffs in that case argued that the CFTC 1990 Statutory Interpretation "radically revised" the underlying purpose test and replaced it with a more "objective" one, under which contracts "should be considered legal forward contracts whenever they are entered into between commercial parties in connection with their businesses, and when the contracts set forth specific delivery obligations imposing on the parties substantial risks of an economic nature." *Id.* at 182. The Court rejected this argument, stating:

> Although the Customers are correct to note that the 1990 Statutory Interpretation clarified that routine physical delivery under a contract is not an absolute precondition for application of the forward contract exception, the Customers overstate the CFTC's holding when they contend that this opinion marks an abandonment of the underlying purpose test altogether.... In fact, far from undermining the traditional forward contract analysis, the CFTC explicitly reiterated the proposition that to identify a forward contract, the "transaction[s] must be viewed as a whole, with a critical eye towards [their] underlying purpose."

*Id.* at 183 (quoting CFTC 1990 Statutory Interpretation, at 39190). The *Knight II* court found that if it were to consider the flexie contracts in isolation, it "might be inclined to grant MG's motion against most of the Customers in [the] case." *Id.* at 185. However, because "the record contain[ed] evidence that the flexies may have been negotiated as part of larger transactions, which included the sale not only of flexies but of certain ratable contracts," the court concluded that the underlying purpose of the flexie contracts presented a genuine issue of material fact to be resolved at trial. *Id.* at 187–88. In reaching its conclusion, the court noted that MGRM's former president admitted that he implemented a strategy to offer customers a "risk management situation in which [MGRM] tried to fix [the customers'] price at a level that [MGRM] thought would be attractive when the market was in the lower third of what [MGRM] perceived to be its normal pattern." *Id.* at 187. Relying on this description of MGRM's strategy, the court stated:

> When viewed as part of these larger, ongoing transactions, some of the descriptions of the transactions between MG and the Customers might thus be read to suggest that the flexies were viewed by both as instruments for insuring against certain price fluctuations that might arise as petroleum was delivered under the terms of the ratable or other contracts.

*Id.* at 187–88.

 Applying the analysis in *Knight II* to the instant case, the Magistrate Judge found that the record clearly indicated that RK Distributing, Merritt Oil and Higginson Oil had all entered into their respective flexie contracts for purely speculative purposes. (Report at 23.) In their objections, Plaintiffs contend that the Magistrate Judge incorrectly applied the

legal standard for the forward contract exception set out in *Knight II*.[5] More specifically, Plaintiffs assert that "Judge Eaton recommends a rule whereby a contract qualifies as a forward contract only if, at the time of contracting, the parties planned to take physical delivery under the terms of the specific contracts in dispute." (Pls.' Obj. at 15.) Plaintiffs are incorrect.

The Report clearly concluded that the "underlying motivation" of RK Distributing, Merritt Oil and Higginson Oil for entering into these transactions was to engage in speculation. The Report noted: "[Plaintiffs] intended to 'blow out' these contracts by obtaining one or more cash payments during times when the price of gasoline and diesel fuel spiked, and it was highly likely that these prices would spike during the next five to ten years." (Report at 23.) The record fully supports the Magistrate Judge's conclusion.

### a. *RK Distributing*

In a declaration dated August 2, 1995, RK Distributing's President, Thomas Cowden, stated, "I saw the [flexie] contract not as an avenue to take delivery of gasoline, but as a *speculative investment* or *gamble* that the market price of gasoline would rise above 62 cents. . . . I had no intention of taking delivery of 42,000,000 gallons [the amount covered by the flexie contract] and, in fact, did not have the capacity to take delivery of this much gasoline." (Report at 24 (quoting Declaration of Thomas Cowden, dated August 2, 1995, attached as Ex. 3 to Defs.' Mot. at 2) (emphasis added).) Although Cowden later tried to retract this statement in a subsequent declaration, the Court fully agrees with the Magistrate Judge's conclusion that any reasonable jury would find that RK Distributing entered into its flexie contract for purely speculative purposes. Furthermore, as the Report notes, RK Distributing "never had a ratable contract with MGRM, and never took delivery of any product from MGRM." (Report at 23.) Accordingly, there were no other contracts with MGRM that the flexie contract could possibly have hedged.

### b. *Merritt Oil*

Similarly, in 1995, Richard Merritt, who then owned 50 percent of Merritt Oil, gave a sworn declaration stating that: "I fully expected the price to spike above 62 cents some time in the ten years [during the life of the flexie contract]." (Report at 29.)[6]

---

**5.** Although Plaintiffs also assert that the flexie contracts at issue qualify for the trade option exception, they are clearly incorrect. As the court found in *Knight II*:

> To qualify as a "commodity option" . . . an instrument must give the offeree a right, but no obligation, to make or take delivery of a physical commodity at a fixed price and within a specified time. Although the Customers suggest that the flexie language makes them "offerees" of a "trade option", . . . these contracts unambiguously place[] an obligation on each Customer to take delivery sometime within the five or ten year terms set by the individual instruments. The blow-out provisions of these contracts are, moreover, only triggered in the event of a price spike. Because the flexies contain an obligation in all other

circumstances, they cannot be considered options at all under the law, and so cannot meet an important threshold requirement for application of the CEA's trade option exception.

25 F.Supp.2d at 181 (citing *United States v. Bein*, 728 F.2d 107, 111–12 (2d Cir.1984) and *CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149, 1154–55 (S.D.N.Y.1979)). Like the flexie contracts in *Knight II*, the flexie contracts in the instant case obligated Plaintiffs to take delivery if there was no price spike and thus "cannot be considered options at all." *Id.*

**6.** Under the flexie contracts, 62 cents was the petroleum price above which Plaintiffs could exercise the cash blow-out option. *See supra,* Part I.

Furthermore, a salesperson from MGRM told Merritt that the market price was likely to rise above 62 cents, "so Merritt Oil would never have to take delivery under the contract and could make a lot of money." (*Id.*) This statement is corroborated by a note that Merritt wrote in 1993 that states: "If price on Merc [Mercantile Exchange] goes over 62, they will sell within 45 days and each penny is worth $840,000—to us. We *don't ever pull any product.*" (Report at 30, citing MG Ex. 34.)

After the close of discovery, Merritt submitted a declaration describing hypothetical situations in which he would have wanted to take delivery of petroleum under the flexie contract. (*See* Declaration of Richard Merritt, dated October 31, 2001, included in Declarations in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement, dated November 7, 2001.) According to Merritt's declaration, if the market price ever exceeded the price in the flexie contract, "it would have been easy for me to sell the entire contract volume." (Report at 31.) However, as the Report notes, the flexie contracts required that a customer notify MGRM forty-five days before it wanted physical delivery. In this situation, Merritt Oil could not have "easily" re-sold the petroleum obtained from the flexie contract unless the market price stayed above the contract price at the end of forty-five days.

Such an eventuality was unpredictable at best, and if the market price of petroleum fell significantly below the price in the flexie contracts, Merritt Oil would have faced an enormous loss. Merritt Oil has presented no evidence that it, or any other petroleum customer, ever bought and re-sold large amounts of petroleum with this amount of risk involved. Merritt's written statement that "[w]e don't ever pull any product" confirms that he did not enter into the flexie contract with an intent to

possibly commit to take delivery of large amounts of petroleum at a fixed price and attempt to resell it on the market forty-five days later. (*See* Report at 31.)

Although Plaintiffs are correct to note that the question of a party's intent for entering into a contract is typically a jury question (*See* Pls.' Obj. at 15), "ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 486 and 489 (1983) and Fed. R.Civ.P. 56(e)). Merritt's self-serving statements that he would have wanted to take delivery of petroleum in some circumstances were made after the close of discovery in this case and clearly contradict his sworn statements from 1995. Merritt's later statements "are insufficient to raise a triable issue of material fact, and hence were properly disregarded" by the Magistrate Judge. *Id.* Accordingly, the Court agrees with Magistrate Judge's conclusion that "no reasonable jury could find that Merritt's purpose was to take delivery of these huge volumes of ... product, which vastly exceeded his 1993 ... sales volume." (Report at 31.)

c. *Higginson Oil*

Like Cowden and Merritt, Kim Wayne Higginson, the former Vice President and current President of Higginson Oil, gave a sworn declaration indicating that he never intended to take delivery of physical product under the flexie contract:

> Mr. Gelvin [MGRM's salesperson] presented the [flexie] contract to me as one under which it was not likely that I would ever have to take delivery of gasoline. His emphasis and primary selling point was the likelihood that the market

price of gasoline would rise above 62 cents, and therefore there would be no obligation to take any delivery under the contract. . . . Based on Mr. Gelvin's representations . . ., and my own experience in the business, I *felt certain* that the market price of gasoline would rise above 62 cents sometime during the term of the [flexie] contract.

(Report at 32 (emphasis added).) Six years later, Higginson sought to modify part of this statement, indicating that his use of the word "certain" was too strong. (Report at 33.) Like Merritt, Higginson also presented a hypothetical situation in which he contends he would have taken delivery of the petroleum under the flexie contract and re-sold it for a profit. As with Merritt, the submission of this hypothetical presents speculative and conclusory assertions of fact which the Court may disregard on a motion for summary judgment. *See BellSouth Telecommunications*, 77 F.3d at 615.

Plaintiffs also assert that the Magistrate Judge incorrectly concluded that no reasonable jury would find that the flexie contracts entered into by Higginson Oil, RK Distributing and Merritt Oil were "negotiated as part of larger transactions."

(Pls.' Obj. at 18.) They contend that the Magistrate Judge "reduces this discussion to the trivial question of whether a customer's flexie matches the customer's ratable contracts, gallon-for-gallon and product-for-product." (*Id.*) The Plaintiffs are incorrect. As discussed above, the Magistrate Judge considered a number of sworn statements made by officers of RK Distributing, Merritt Oil and Higginson Oil, as well as the relative quantities of petroleum covered by the ratable and flexie contracts. These statements, combined with the fact that there was little or no match between the volumes of petroleum covered by the ratable and the flexie contracts, amply support the Magistrate Judge's conclusion that there is no genuine issue of material fact as to the underlying purpose of the flexie contracts with respect to these three plaintiffs.[7]

#### d. *Satterfield Oil Co.*

■ With respect to the other nine plaintiffs, the Magistrate Judge stated that he could not conclude that "the evidence concerning [their] motivations . . . is so one-sided as to call for summary judgment." (Report at 34.) Defendants assert that this conclusion is incorrect with re-

---

7. Contrary to Plaintiffs' assertions, this conclusion is not necessarily inconsistent with the analysis in *Knight II*. In that case, the court found that MGRM's "descriptions of the transactions between MG and the customers might . . . be read to suggest that the flexies were viewed by both as instruments for insuring against certain price fluctuations that might arise as petroleum was delivered under the terms of the ratable or other contracts." *Knight II*, 25 F.Supp.2d at 187–88. Plaintiffs contend that the same is true in the instant case and therefore, summary judgment is inappropriate. The problem with Plaintiffs' argument is that it assumes that the facts in *Knight II* and the instant case are the same. Plaintiffs are correct that in both cases, MGRM marketed the flexie contracts as a part of their risk management programs. But in the instant case, there are clear statements by officers of RK Distributing, Merritt Oil and Higginson Oil that they did not enter into the flexie contracts with an intent to take delivery of the petroleum. Furthermore, there is no evidence in the record to suggest that they entered into the flexie contracts for any other legitimate purpose. It is unlikely that the plaintiffs in *Knight II* made similar statements, otherwise such statements would have been considered in the court's analysis. However, the precise facts of *Knight II* are immaterial. A court's consideration of a motion for summary judgment is necessarily fact specific. Based on the record in the instant case, this Court concludes that there is no issue of material fact with respect to the underlying purpose of the flexie contracts entered into by RK Distributing, Merritt Oil and Higginson Oil.

spect to Satterfield Oil Co. ("Satterfield Oil"). The Court agrees with the Defendants that Satterfield Oil was in a position similar to Higginson Oil, namely that it would have been very difficult and risky for the company to notify MGRM that it wanted to take delivery of the entire volume under the flexie contract. The flexie contract covered 126,000,000 gallons of petroleum, whereas the company's 1993 annual sales were a fraction of that at 9,000,000 gallons. As with Higginson Oil, it is very unlikely that Satterfield Oil would have taken delivery with an intent to resell the petroleum on the open market, in light of the 45–day notice requirement for physical delivery under the contract.

However, it is not entirely clear that Satterfield Oil entered into the flexie contract for purely speculative purposes. Unlike the officers of RK Distributing, Merritt Oil and Higginson Oil, the President of Satterfield Oil, M.M. Satterfield, Jr., did not give a declaration indicating that he viewed the flexie contracts as a way to speculate on the petroleum markets. Although he stated that he entered into the flexie contract because he wanted to get involved in futures trading, he also stated that he entered MGRM's "program" to help manage his inventory costs. (*See* Deposition of M.M. Satterfield, dated August 16, 2000, attached as Ex. E to MG Defendants' Memorandum of Law in Support of Their Objections to Magistrate Judge Eaton's Report and Recommendation, dated February 8, 2002 ("Defs.' Obj."), at 87–88.) It is unclear from the record what MGRM's "program" was and whether it was somehow linked to legitimate hedging or managing inventory costs. Although this seems unlikely in light of the quantities of petroleum involved, it is not sufficiently clear to support granting summary judgment with respect to Satterfield Oil.

2. *Are the Flexie Contracts Enforceable?*

Plaintiffs assert that even if the Court finds that the flexie contracts entered into by RK Distributing, Merritt Oil and Higginson Oil violate the CEA, such a finding would only render the contracts voidable under the Restatement (Second) of Contracts (the "Restatement") and Judge Kaplan's decision in *Commodity Futures Trading Comm'n v. Hanover Trading Corp.*, 34 F.Supp.2d 203, 206 (S.D.N.Y.1999). (*See* Pls.' Obj. at 11.) In his Report, the Magistrate Judge fully considered and rejected the same argument. On this issue, the Magistrate Judge noted that the Restatement prescribes that a contract is unenforceable if its enforcement "is clearly outweighed in the circumstances by a public policy ...." (Report at 36–37 (quoting Restatement (Second) of Contracts § 178 (1981)).) Reviewing the CEA and the record in the instant case, the Magistrate Judge concluded that: (1) the CEA expressed a strong public policy that trading parties covered by the Act comply with its terms; (2) the parties' "justified expectations" did not call for keeping the flexie contracts in force for ten years; and (3) if enforcement is denied, it would not result in any forfeiture by RK Distributing, Merritt Oil or Higginson Oil. (Report at 36–39 (quoting Restatement § 178).) The Court fully agrees with the Magistrate Judge's conclusion.

Although the CEA does not explicitly address the issue, it is well established that contracts that offend the underlying purpose of a statute are unenforceable. *See United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (explaining that when a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions]" a

court must inquire into "whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute]."). The theory supporting this policy is that a promise to do something unlawful is not consideration, and the party who has promised to do something lawful may not sue because there is no mutuality of consideration. *See In re MG Refining & Marketing, Inc. Litigation,* No. 94 Civ. 2512, 1997 WL 23177, *2 (S.D.N.Y. Jan. 22, 1997) (*"Knight I"*) (citing Restatement (Second) of Contracts § 607). On this issue, the Second Circuit has stated that "[u]nder both federal and state law, illegal agreements ... have long been held to be unenforceable and void." *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 28 (2d Cir.1989); *see also Bromberg v. Moul,* 275 F.2d 574, 577 (2d Cir.1960).

■ As discussed above, § 4 of the CEA clearly states that it is unlawful for any person to enter into "a contract for the purchase or sale of a commodity for future delivery" unless such transaction is conducted on a commodities exchange approved by the CFTC. 7 U.S.C. § 6(a). This provision is central to the Act's primary purpose of preventing fraud and protecting investors. *See Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 303, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) ("[T]he express will of Congress is that to deal in commodity futures one must either be, or deal through, a member of a board of trade having specified qualifications and carrying official designation as a contract market."); *see also Commodity Futures Trading Com'n v. British American Commodity Options Corp.,* 788 F.2d 92, 94 (2d Cir.1986). Furthermore, as the Magistrate Judge noted, at the time Plaintiffs entered into the flexie contracts in this case, the CEA provided that entering into an off-exchange futures contract was a felony punishable by a fine of up to $1,000,000 and imprisonment for up to five years. (Report at 37) (citing 7 U.S.C. § 13(a)(5).) Considering the CEA's central purpose of protecting investors by requiring that unexempted commodities transactions be executed on a designated board of trade, this Court fully agrees with the Magistrate Judge that unlawful off-exchange contracts are unenforceable.

Contrary to Plaintiffs' assertions, this conclusion is not inconsistent with Judge Kaplan's decision in *Hanover Trading,* 34 F.Supp.2d at 206. The facts of *Hanover Trading* were very different from the instant case. In that case, the CFTC sued Hanover Trading Corporation ("Hanover") and a number of so-called "relief defendants"—those who are not charged with wrongdoing—asserting that Hanover misappropriated customer funds and made fraudulent solicitations to investors to enter into unlawful off-exchange commodities contracts. *Hanover Trading,* 34 F.Supp.2d at 204. The CFTC settled the case with respect to all defendants except one relief defendant named Aronowitz. *Id.* Aronowitz, who worked for Hanover, helped solicit customers to enter into the transactions, but there was no evidence that he knew of the fraudulent nature of his employer's conduct. *Id.* at 205. The CFTC sought to have Aronowitz disgorge the commissions that he had earned from Hanover, based on the theory that since the contracts he had sold were unlawful and unenforceable, he had not acquired legal and equitable title to the funds. *Id.* In turn, this theory was based on the assumption that Hanover never held a legitimate interest in the funds because the contracts it had sold violated the CEA and were void as a matter of law. *Id.* at 206. Rejecting this argument, the court stated:

[T]he Commission's argument here flies in the face of a plethora of authority holding that even contracts made in violation of the securities laws, and thus subject to Section 29(b) of the Securities

Exchange Act of 1934, which states that such contracts are 'void,' are merely voidable at the option of the innocent party.

*Id.* (citing *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 387, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). Although this analogy was perhaps useful in *Hanover Trading,* it has no application to the instant case. As the Magistrate noted in his Report:

> Most violations of the 1934 Act consist of fraudulent representations .... The Commodity Exchange Act is different from the 1934 Act in many ways, but some of its violations also consist of fraudulent sales practices. *In such cases,* it makes sense to analogize to Section 29(b) of the 1934 Act.

(Report at 40 (emphasis added).) Plaintiffs in this case are not in the same position as the relief defendant in *Hanover Trading* because they have not established that Defendants engaged in any fraudulent conduct. *(Id.)* [8] Furthermore, it is not plausible that RK Distributing, Merritt Oil or Higginson Oil had any "justified expectations" in being able to enforce the flexie contracts. In *Hanover Trading,* the CFTC sought to "seize funds paid as compensation for services actually performed for [Hanover] ... [a]nd the fact that [the relief defendant] performed services for Hanover for which he presumably was entitled to be paid—is significant." *Hanover Trading,* 34 F.Supp.2d at 207. In contrast, there is no evidence in the instant case that RK Distributing, Merritt Oil or Higginson Oil gave money or "acted to their detriment in reliance on the flexies." (Report at 39.)

**8.** As the Magistrate Judge noted in his Report, "in the case at bar ... there is no claim that the contract was entered into because of any misrepresentations. Hence it would be too glib to talk about an 'innocent party,' at whose option the contract is voidable." (Report at 40.)

### 2. *The CFMA's Contract Enforcement Provision*

Plaintiffs and amici both assert that the Magistrate Judge's Report erred in its failure to apply the CFMA to the transactions at issue in this case. More specifically, they contend that the CFMA's contract enforcement provision, codified at 7 U.S.C. § 25(a)(4) (Supp.2001), renders the flexie contracts at issue in this case enforceable, regardless of any violation of the CEA. In his Report, the Magistrate Judge applied the standard set forth in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) and concluded that the CFMA does not apply retroactively to the flexie contracts at issue. (Report at 42.) The Court agrees.

As the Supreme Court noted in *Landgraf,* "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than the Republic." 511 U.S. at 265, 114 S.Ct. 1483. Absent a constitutional violation, however, a Court is bound to apply civil legislation retroactively if that is what Congress clearly intended. *Id.* at 267–68, 114 S.Ct. 1483. The requirement that Congress "first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268, 114 S.Ct. 1483.

On December 21, 2000, Congress amended the Commodities Exchange Act through the enactment of the CFMA. *See* Commodities Futures Modernization Act, Pub.L. No. 106–554, 114 Stat. 2763 (2000).[9]

**9.** Although the question of whether the CFMA applies retroactively does not appear to have been definitively addressed by any other federal court, the Second Circuit, while declining to decide the issue, has noted: "To prevail on a retroactivity argument [with the CFMA], [plaintiff] faces a substantial burden. 'Elementary considerations of fairness dictate

The CFMA inserted a new sub-section into 7 U.S.C. § 25 entitled "Contract enforcement between eligible counterparties":

> No agreement, contract, or transaction between eligible contract participants [10] or persons reasonably believed to be eligible contract participants, and no hybrid instrument sold to any investor, shall be void, voidable, or unenforceable, and no such party shall be entitled to rescind, or recover any payment made with respect to, such an agreement, contract, transaction, or instrument under this section or any other provision of Federal or State law, based solely on the failure of the agreement, contract, transaction, or instrument to comply with the terms or conditions of an exemption or exclusion from any provision of this chapter or regulations of the Commission.

7 U.S.C. § 25(a)(4). As the Report notes, Plaintiffs argue that this new sub-section applies to the 1993 flexie contracts because 7 U.S.C. § 25(d), which was added in 1983, states:

> The provisions of this section shall become effective with respect to causes of action accruing on or after the date of enactment of the Futures Trading Act of 1982 [January 11, 1983]: Provided, That the enactment of the Futures Trading Act of 1982 shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date.

The Magistrate Judge found that sub-section (d) only applies to private rights of action created by section 25, and not to breach of contract actions based on state law, such as those asserted in the instant case. (Report at 43.) The Magistrate Judge also found that, under the standard set out in *Landgraf,* the CFMA's insertion of the new contract enforcement provision did not evince a "clear congressional intent" to retroactively make unlawful off-exchange contracts enforceable. (*Id.*)

Plaintiffs contend that: (1) the time limitations in sub-section (d) unambiguously apply to all provisions of section 25, including the contract enforcement provision, which Congress inserted into the code seventeen years after sub-section (d) was created, and (2) applying the contract enforcement provision to the flexie contracts in

---

that individuals should have an opportunity to know what the law is and to conform their conduct accordingly....' " *Caiola v. Citibank,* 295 F.3d 312, 327 (2d Cir.2002) (quoting *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483).

**10.** The term "eligible contract participant" is defined in another sub-section of Title 7 that was created with the enactment of the CFMA: "[E]ligible contract participant" means— acting for its own account ... a corporation, partnership, proprietorship, organization, trust, or other entity ... that has a net worth exceeding $1,000,000; and enters into an agreement, contract, or transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by the entity in the conduct of the entity's business .... 7 U.S.C. § 1a(12)(A)(v)(III). In his Report, the Magistrate Judge concludes that even if

the contract enforcement provision of the CFMA did apply to the flexie contracts, it would not change his recommendation because "neither RK Distributing, nor Higginson Oil, nor Merritt Oil had a net worth exceeding $1,000,000 in 1993." (Report at 43.) Thus, under the terms of 7 U.S.C. § 1a(12)(A)(v)(III), quoted above, these three plaintiffs were not "eligible contract participants" in 1993 and their flexie contracts would not be covered by the contract enforcement provision of the CFMA. Having reviewed the record, the Court agrees. (*See* Financial Statements of RK Distributing, Higginson Oil, and Merritt Oil attached as Ex. A to Supplemental Affidavit of Robert B. Bernstein with Exhibits and Testimony Cited in MG Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment, dated November 26, 2001.)

the instant case does not raise retroactivity concerns because the provision would not take away any vested rights or disrupt any justified expectations held by the parties. The Court disagrees.

 As the Report notes, *Landgraf* clearly sets out the standard that the Court must apply to determine whether the CFMA covers the contracts at issue in this case:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

511 U.S. at 280, 114 S.Ct. 1483.

 In the instant case, the Court agrees with the Magistrate Judge that Congress has not "expressly prescribed" the CFMA's temporal reach. On January 11, 1983, a new "section 22" was inserted into the CEA when the Futures Trading Act of 1982 came into force. *See* Futures Trading Act of 1982 (the "FTA"), Pub.L. No. 97–444 § 235, 96 Stat. 2294, 2322–24 (1983) (codified at 7 U.S.C. § 25). Section 22(a)(1) of the CEA now provides that any person who violates the Act "shall be liable for actual damages" resulting from the violation. FTA § 235, 96 Stat. at 2322. Section 22(a)(2) provides that the causes of action authorized by this new section, with some minor exceptions, "shall be the exclusive remedies under [the CEA] available to any person who sustains loss as a result of any alleged violation of this Act." *Id.* at 2323. Finally, section 22(d) provides that "[t]he provisions of this section shall become effective with respect to causes of action accruing on or after the date of enactment of the Futures Trading Act of 1982 ...." *Id.* at 2324. It is clear from the text of the FTA that the time limitations set out in section 22(d) apply to the statutory causes of action created by section 22.

When Congress enacted the CFMA in December 2000, it modified parts of section 22(a)(1) and (2) and added a new "section 22(a)(4)," the contract enforcement provision which is quoted above. Section 22(a)(4) provides that no contract between "eligible contract participants" shall be "void, voidable or unenforceable" due to the contract's failure to comply with an exemption or exclusion under the CEA. CFMA § 120, 114 Stat. at 2763A–404 (codified at 7 U.S.C. § 25(a)(4)). Although the wording of the section's text indicates that it eliminates certain defenses to breach of contract actions, there is nothing to suggest that it creates a new statutory cause of action. Thus, the time limitations of section 22(d), which apply to causes of action arising under section 22, do not seem to apply to this new sub-section. At the very least, Congress did not "expressly prescribe" such a result. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.[11]

---

**11.** Congressman Leach's statement on the CFMA does not support Plaintiffs' assertion that Congress intended the contract enforcement provision to apply retroactively. In a speech before the House of Representatives on October 19, 2000, Congressman Leach stated: "Because of anachronistic constraints established under the Commodity Exchange Act, legal uncertainty exists for trillions of dollars of existing contractual obligations. This bill resolves this uncertainty for the benefit of customers of many of these products,

Having concluded that Congress did not "expressly prescribe" the CFMA's temporal reach, the next question under *Landgraf* is whether the application of section 22(a)(4) to the flexie contracts at issue in this case "would have retroactive effect." *Id.* This question presents a more difficult issue. Although statutory retroactivity is generally disfavored, "deciding when a statute operates retroactively is not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. As the Supreme Court noted in *Landgraf,* Justice Story has provided influential guidance on this topic: "[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective . . . ." *Id.* at 269, 114 S.Ct. 1483 (quoting *Society for the Propagation of Gospel v. Wheeler,* 22 F. Cas. 756 (C.C.D.N.H. 1814) (No. 13, 156)).

Seeking to rely on Justice Story's opinion, Plaintiffs assert that the contract enforcement provision of the CFMA does not raise retroactivity concerns because MGRM had no "vested right" to get out of its contracts by invoking an illegality defense. (*See* Pls.' Obj. at 7–8.) However, Justice Story's opinion "merely described" that the impairment of a vested right "constituted a *sufficient,* rather than a *necessary,* condition for invoking the presumption against retroactivity." *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (emphasis in original). Instead, the Supreme Court has used "various formulations to describe the 'functional conception[n] of legislative retroactivity,' and

made no suggestion that Justice Story's formulation was the exclusive definition of presumptively impermissible retroactive legislation." *Id.* (quoting *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483).

*Hughes Aircraft* is instructive on this point. In that case, a former employee of a government subcontractor brought a *qui tam* action under the False Claims Act (the "FCA") against his former employer, alleging that it had knowingly mischarged the government some time before 1986. *Id.* at 942, 117 S.Ct. 1871. Prior to the enactment of an amendment to the FCA in 1986, such suits were barred if the information on which they were based was already in the government's possession. *Id.* Acknowledging that the government had knowledge of the alleged mischarging, the employee asserted that the 1986 amendment to the FCA applied retroactively, thus permitting his case to proceed. The Supreme Court disagreed, stating: "Given the absence of a clear statutory expression of congressional intent to apply the 1986 amendment to conduct completed before its enactment, we apply our presumption against retroactivity and hold that, under the relevant 1982 version of the FCA, the District Court was obliged to dismiss this action . . . ." *Id.* at 952, 117 S.Ct. 1871.

Like Plaintiffs in the instant case, the employee in *Hughes Aircraft* asserted that the 1986 amendment did not have a retroactive effect because it did not impose new duties with respect to transactions already completed. In response, the Court stated:

> The same argument was made, and rejected, in *Landgraf.* There, we noted that the provision of the Civil Rights Act

*but it does not fully resolve the legal certainty issue for some kinds of future activities."* 146 Cong. Rec. E1877–02 (2000) (speech of Congressman James A. Leach) (emphasis added). The CFMA is an extensive statute that introduced many changes to the CEA. General

comments about resolving legal uncertainty for existing contractual obligations do not indicate that Congress has "expressly prescribed" the retroactive application of any particular provision. *See Landgraf,* 511 U.S. at 268, 114 S.Ct. 1483.

of 1991 authorizing compensatory damages 'does not make unlawful conduct that was lawful when it occurred,' but we '[n]onetheless' held that 'the new compensatory damages provision would operate retrospectively if it were applied to conduct occurring before' its effective date.

*Id.* at 947–48, 117 S.Ct. 1871 (quoting *Landgraf,* 511 U.S. at 281–282, 114 S.Ct. 1483). The employee in *Hughes* also maintained that the 1986 amendment had no retroactive effect because it did not "change the substance of the extant cause of action, or alter a defendant's exposure for a false claim and thus [did] not 'increase a party's liability for past conduct.'" *Hughes Aircraft,* 520 U.S. at 948, 117 S.Ct. 1871 (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483). The Court rejected this argument as well:

> While we acknowledge that the monetary liability faced by an FCA defendant is the same whether the action is brought by the Government or by a *qui tam* relator, the 1986 amendment *eliminates a defense* to a *qui tam* suit—prior disclosure to the Government—and therefore changes the substance of the existing cause of action for *qui tam* defendants by "attach[ing] a new disability, in respect to transactions or considerations already past."

*Id.* (quoting *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483) (emphasis added).

In the instant case, unlawful off-exchange contracts were clearly unenforceable before the enactment of the CFMA.[12]

To the extent that the CFMA now renders certain off-exchange contracts enforceable, the statute "eliminates a defense" to a breach of contract action and "therefore changes the substance of the existing cause of action for ... defendants by 'attach[ing] a new disability, in respect to transactions or considerations already past.'" *Id.*[13] Accordingly, the Court concludes that the "presumption against retroactivity" applies to the contract enforcement provision of the CFMA and that the flexie contracts in the instant case are unenforceable. *Id.* at 952, 117 S.Ct. 1871.

## C. PIERCING THE CORPORATE VEIL OF MGAG AND MG CORP.

In his Report, the Magistrate Judge recommends that the Court rule that MG Corp. and MGAG, the parents of MGRM, are not entitled to summary judgment as to any of the plaintiffs except Dalton Petroleum, RK Distributing, Merritt Oil and Higginson Oil. (Report at 48.) Defendants object to this recommendation, asserting that MGAG and MG Corp. are entitled to complete summary judgment with respect to all plaintiffs because they have not presented sufficient evidence to "pierce the corporate veil" and hold MGAG and MG Corp. liable for the conduct of their subsidiary, MGRM. More specifically, Defendants assert that: (1) the Magistrate Judge's recommended holding that "a breach of contract, without more, is sufficient to satisfy the 'fraud or wrong' prong of New York's veil-piercing standard is wrong as a matter of law;" and (2) "in

---

12. *See supra,* Part II.B.2.

13. The Court acknowledges that there is a certain irony in this conclusion. MGRM marketed the flexie contracts at issue in this case and now asserts that the CFMA does not apply retroactively because the statute would eliminate a defense of illegality to its breach of the very contracts that it once offered. MGRM cannot plausibly maintain that, at the time it entered into the flexie contracts, it expected to be able to later breach those contracts and assert a defense of illegality. However, like the statutory provisions considered in *Hughes Aircraft,* the CFMA contract enforcement provision does eliminate a defense and this Court is bound to refrain from applying a statute retroactively absent "clear congressional intent." *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.

concluding that there was sufficient evidence of MG Corp. and MGAG's 'domination and control' of MGRM" with respect to the alleged breach of contract, the Magistrate Judge "rewrote plaintiffs' complaint with respect to the alleged breach at issue." (Defs.' Obj. at 1–2.) The Court disagrees with the first assertion. Although the Court agrees, in part, with the second assertion, the Court nevertheless concludes that the record supports the Magistrate Judge's ultimate recommendation.

Defendants' first argument is based on an assumption that the Magistrate Judge erroneously relied on *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24 (2d Cir.1993), which Defendants allege has been effectively overruled by subsequent caselaw. (Defs.' Obj. at 3–5.) In *Carte Blanche*, plaintiff Carte Blanche (Singapore) ("CBS") had obtained an arbitration award from Carte Blanche International ("CBI"), based on CBI's breach of a franchise agreement between CBS and CBI. Unable to collect on its award, CBS brought an action against Diners Club International, the corporate parent of CBI. In its decision, the Circuit Court initially set out its understanding of relevant New York law: "While 'New York is reluctant to pierce corporate veils,' exceptions are made in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary."

*Carte Blanche*, 2 F.3d at 25. The court further elaborated that determining whether a parent corporation's control and domination requires a court to disregard the corporate form calls for an examination of a number of factors.[14] Considering a number of these factors, the court held that "the breach of the franchise agreement that caused CBS to suffer the damages found by the arbitrators was the result of domination and control of CBI by its parent, Diners Club." *Id.* at 26–27.

Although the Second Circuit has not explicitly overruled *Carte Blanche*, it has acknowledged that the veil piercing standard under New York law has shifted:

> In *Carte Blanche*, we held that New York law permits plaintiffs to pierce the corporate veil either "to prevent fraud or other wrong, *or* where a parent dominates and controls a subsidiary." Since the district court's decision, we have interpreted *Carte Blanche* to require, in order to pierce the corporate veil, "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."

*Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 96 (2d Cir.1997) (quoting *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.

---

**14.** Such factors may include:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corpo-

ration, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other corporations as if it were their own.

*Carte Blanche*, 2 F.3d at 26 (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

1997)) (emphasis in original); *see also Matter of Morris v. New York State Dep't of Taxation & Finance*, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160–61 (1993).

Defendants in the instant case assert that the Magistrate Judge failed to realize that *Carte Blanche* misstates the law on New York's veil piercing standard and that, as a result, he erroneously rejected their argument that a subsidiary's breach of contract, without more, is legally insufficient to satisfy the "fraud or wrong" prong of New York's veil-piercing standard. (Report at 44.) Although Defendants are correct that the two prongs of the veil piercing standard under New York law are conjunctive rather than disjunctive, the Court nevertheless concludes that the Magistrate Judge's ultimate recommendation to deny summary judgement is fully supported by the record.

In his Report, the Magistrate Judge found that a reasonable jury could conclude that:

> In December 1993, MGAG planned to get rid of the flexie contracts, because "those contracts definitely are not good for us." MGAG directed the firing of the officers of MGRM, who believed that the flexies were lawful and appropriate. MGAG directed MG Corp. to hire Nancy Kropp Galdy, who promptly unwound all of MGRM's hedges securing the flexie contracts.

(Report at 46 (quoting *Metallgesellschaft Corp., et al. v. W. Arthur Benson, et al.,* American Arbitration Association Case No. 1311637194 (1995), Arbitration Transcript ("Arb.Tr."), attached to Pls.' Opp., at 1372–73 (testimony of Hans Nolting)).) The Magistrate Judge later summarized his findings:

> I find that, as to each plaintiff, the transaction at issue was the dishonoring of a ten-year contract. The plaintiffs allege that there was a long campaign to get rid of the flexie contracts, including the December 1993 unwinding of the hedges, the January 1994 cancellation letter, the July 1995 Consent Order, and the refusal to make the 'blow out' payments demanded by plaintiffs . . . .

(Report at 47.)

▇▇ Having conducted an independent review of the record, the Court agrees with these factual findings. The record presents a genuine issue of material fact as to whether MGAG or MG Corp. completely dominated MGRM and through such domination sought, in bad-faith, to evade the company's obligations under the flexie contracts. If a jury were to make such findings, it would support piercing the corporate veil to hold either one or both companies liable.

The cases that Defendants cite are inapposite. In *TNS Holdings, Inc. v. MKI Securities Corp.*, 92 N.Y.2d 335, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998), for example, the facts were significantly different from the instant case. In that case, plaintiffs sought to enforce an arbitration clause against defendant Batchnotice, her sister corporation, MKI, and her parent corporation, MAI. *Id.* at 750. Defendants MKI and MAI moved to stay the arbitration proceedings against them on the grounds that they were not parties to the arbitration agreement. *Id.* The Court, applying the New York veil piercing standard, held that "plaintiffs have failed to show that, even if MKI dominated Batchnotice, that control resulted in some fraud or wrong mandating disregard of the corporate form in this case." *Id.* at 751. Explaining its reasoning, the court stated: "There is no showing that through its domination, MKI misused the corporate form for its personal ends so as to commit a fraud or wrongdoing or *avoid any of its obligations.*" *Id.* (citing *Morris*, 603

N.Y.S.2d 807, 623 N.E.2d at 1160) (emphasis added).

In contrast, the record in the instant case presents a genuine issue of material fact as to whether MGAG or MG. Corp. (1) completely dominated business decisions being made at MGRM; and (2) used such domination to cause MGRM to attempt to avoid its obligations under the flexie contracts. Defendants' assertion that a breach of contract, without more, is insufficient to satisfy the "fraud or wrong" prong of New York's veil-piercing standard mistakenly presupposes that the record could only support a finding of a simple breach of contract. However, based on the current record in this case, a reasonable jury could conclude that MGAG and MG Corp. conceived of and directed a plan to nullify MGRM's obligation to perform under the flexie contracts. Such a conclusion would easily satisfy the second prong of New York's veil piercing test. *See Thrift Drug,* 131 F.3d at 96.

■ Defendants' second argument is that the Magistrate Judge's Report improperly "rewrote" Plaintiffs' complaint "to charge MGRM with earlier contract breaches, including in particular the removal of hedges in late 1993 and the sending of cancellation letters in early 1994— and then concluded there was sufficient evidence of domination and control with respect to those breaches." (Defs. Obj. at 10) (citing Report at 46–47.) Although portions of Defendants' argument have some merit, the Court concludes that neither MGAG nor MG Corp are entitled to summary judgment on this basis.

The Court does not agree with the Report's conclusion that "[i]f the jury finds that MGAG and MG Corp. dominated the acts in December 1993 and January 1994, but not the later acts, it may still find that those two corporations are liable for causing damage to any plaintiff whose flexie was lawful." (Report at 47.) This conclusion is inconsistent with the allegations contained in Plaintiffs' amended complaint. Count One of the amended complaint charges that:

> On or about July 27, 1995, MGRM breached the flexie contracts by agreeing to the CFTC Consent Order. By entering into that Consent Order precluding its own performance, MGRM breached its continuing obligation to maintain readiness both to deliver product and to pay the Customers for exercise of their option throughout the term of the flexie contracts.

> For their participation in and domination and control over the foregoing, MGAG and MG Corp. are also liable to Plaintiffs under *respondeat superior,* piercing the corporate veil and alter ego doctrines.

(Plaintiffs' First Amended Complaint, dated May 25, 1999 ("Am. Compl."), ¶¶ 111 and 112, attached as Ex. B to Defs.' Obj.) It is clear from the text of the amended complaint that Plaintiffs' breach of contract action is limited to MGRM's agreement to enter into the Consent Order with the CFTC in July 1995. As discussed above, to prove that MGAG and/or MG Corp. are liable for the contract breaches that allegedly resulted from this agreement, Plaintiffs will have to show that: (1) MGAG or MG Corp. completely dominated MGRM; and (2) such domination caused MGRM to enter into the Consent Order. If a jury were to find that MGAG and/or MG Corp. were responsible for MGRM's acts in December 1993 and January 1994, but not for MGRM's agreement to the July 1995 Consent Order with the CFTC, Plaintiffs would be unable to pierce the corporate veil and hold that particular defendant liable for MGRM's conduct. Although the 1993 and 1994 acts may be relevant to issues such as MGRM's motivation for entering into the Consent Order and MGAG

and MG Corp.'s role in such a decision, these acts were not pled as independent breaches of the flexie contracts and cannot provide the basis for piercing the corporate veil alone.[15]

In their objections, Defendants presume that the Magistrate Judge would have granted their motion for summary judgment on piercing the corporate veil had he only considered MGRM's decision to enter into the July 1995 Consent Order. (*See* Defs.' Obj. at 9–10.) According to Defendants' reasoning, this explains why the Magistrate Judge "rewrote" Plaintiffs' complaint to charge MGRM with earlier contract breaches in 1993 and 1994. (*See id.* at 10.) The Court disagrees.

Defendants contend that one particular sentence in the Report supports this argument. The Report states that "there is very little evidence that [MGAG or MG. Corp.] 'procured' the CFTC Consent Order, or that MG Corp. and MGAG dominated MGRM's negotiations with the CFTC investigators." (Report at 45.) Reviewing the record, the Court does not fully agree with this finding. Several pieces of evidence create a genuine issue of material fact as to whether MGAG controlled the negotiations with the CFTC. For example, in an internal letter dated January 9, 1996, the Chairman of MGAG's board, Dr. Neukirchen, informed other board members of the following:

It is obvious that for the new MGRM management these [flexie] contracts were unattractive. [The] CFTC's decision made it possible to terminate these contract conditions with immediate effect.... The conclusion of the settlement with [the] CFTC was imperative for the MG Group.... Under these circumstances the [Board] decided to empower MG Corp. to reach this settlement. We still believe that this was the right decision.

(Letter of Dr. Neukirchen, dated January 9, 1996, attached as Ex. 10 to Pls.' Opp., at 2. (emphasis added).) Plaintiffs allege that MGAG fired certain members of MGRM and replaced them with "new management" to facilitate the execution of their plan to eliminate the flexie contracts. There is some evidence in the record that could support this allegation.

For example, some time in 1993, the President of MGRM, Arthur Benson, was demoted and Nancy Kropp and Michael Hutchinson took over the "day-to-day decision making" at MGRM. (Arb. Tr. at 9694 (testimony of Arthur Benson); Arb. Tr. at 1369 (testimony of Hans Nolting).) Hutchinson, in turn, reported to Hans Nolting, who was a Frankfurt based director of MG Corp. (Deposition of William G. Romanello, dated January 25, 2001, at 149, 164.) In December 1993, Kropp oversaw the elimination of the MGRM's hedge positions for the flexie contracts. Benson

---

**15.** Plaintiffs' position appears to be consistent with this conclusion. In their reply to Defendants' objections, they state:

[The Magistrate Judge] did not rewrite the complaint to charge MGRM with earlier contract breaches.... Judge Eaton held that to determine whether MGAG completely dominated the dishonoring of the flexies and caused a wrong injuring Plaintiffs, it is not enough to examine a snapshot of the scene on July 27, 1995, when MG signed the Consent Order. Instead, he held, a full and accurate understanding of *MGAG's role in the breach* can only be achieved by con-

sidering the Consent Order as merely the culmination of MGAG's flexie avoidance campaign.

(Plaintiffs' Reply to MG Defendants' Objections to Magistrate Judge Eaton's Report and Recommendation, dated March 1, 2002, at 7 (emphasis added).) As discussed above, the Court agrees that events leading up to the alleged breach on July 27, 1995 may be relevant to determine whether Plaintiffs can pierce the corporate veil, but ultimately the jury will only consider whether MGAG or MG Corp. dominated MGRM to agree to the Consent Order.

testified that the following month, she called him and said that "she wanted me to come up to New York immediately to talk about a meeting to see if we could now get rid of those 45–day flexie contracts." (Arb. Tr. at 9696 (testimony of Arthur Benson).)

Soon thereafter, there was a meeting attended by a number of people, including Benson, Kropp and Hutchinson. At that meeting, Hutchinson and others gave Benson advice on how to persuade MGRM's customers to get out of the flexie contracts. (*Id.* at 9697.) Hutchinson suggested that Benson tell the customers that "if the price ran up, that MG wouldn't be around and they wouldn't be able to cover the contracts." (*Id.* at 9698.) Benson became upset because he had already assured MGRM's customers that MGRM was not going to go bankrupt and would honor the flexie and ratable contracts. (*Id.* at 9699–9700.) Ultimately, Benson was fired by the President of MG Corp.

Considering such testimony, the January 9, 1996 letter by Neukirchen, and other pieces of evidence in the record,[16] a jury could reasonable conclude that: (1) a plan to eliminate the flexie contracts was conceived and approved of by officers of MG Corp. and MGAG; and (2) such a plan was executed by installing new management at MGRM and using this new management to eliminate the flexie contracts by voluntarily entering into the CFTC Order. If the jury reaches such conclusions after finding MGRM liable for breaching the flexie contracts, Plaintiffs will be able to pierce the corporate veil and hold MGAG and MG Corp. liable as well.[17]

Finally, the Court notes that Defendants request the Court to defer its ruling on their motion to strike opinions offered by Plaintiffs' experts and allow them to re-institute the motion at a later date if summary judgment is denied in whole or in part. In his Report, the Magistrate Judge found that such a request is appropriate. (*See* Report at 48.) The Court agrees with the Magistrate Judge and adopts his recommendation.

### III. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Defendants' motion for summary judgement is GRANTED with respect to plaintiffs Dalton Petroleum, Inc., RK Distributing, Inc., Merritt Oil Company, and Higginson Oil Company, and is DENIED with respect to all other plaintiffs; and it is further

---

16. For example, on January 27, 1995, MGAG released a Special Audit Report to investigate the activities of MG Corp. and MGRM. MGRM's former Vice President, Cindy Ma wrote a response to the Special Audit Report on behalf of herself and other former members of the management of MGRM. (*See* Response to the Special Audit, dated March 7, 1995 ("Response to Special Audit"), attached as Ex. 16 to Pls.' Opp.) In the Response, Ma states: "[T]he [flexie contract] program was misunderstood by the new management and the crisis management and that contract was a natural candidate for elimination. Since that day, the efforts of the new management have been focusing on justifying the elimination of the [flexie] contracts." Response to Special Audit, at 68.

17. The Court notes that Defendants also make a cursory objection to the Report's recommendation that the Court deny summary judgement with respect to seven of the eight plaintiffs who gave MGRM general releases. This objection, which appears in a footnote on the second to last page of Defendants' Objections, is unsupported by the record and relevant caselaw. The Court agrees with the Magistrate Judge that the scope of the Release Agreements for these seven plaintiffs is ambiguous and that a jury must resolve this ambiguity. (*See* Report at 16–19) (quoting *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965) and *Lanni v. Smith*, 89 A.D.2d 782, 453 N.Y.S.2d 497, 497–98 (4th Dep't 1982).)

**ORDERED** that Defendants' motions to strike opinions offered by Plaintiffs' experts [122–1 and 122–2] is DENIED without prejudice; and it is finally

**ORDERED** that the parties appear for a pre-trial conference before the Court on November 15, 2002 at 3 p.m.

**SO ORDERED.**

### ATTACHMENT

*REPORT AND RECOMMENDATION TO JUDGE MARRERO*

EATON, United States Magistrate Judge.

In this diversity action, sometimes known as *Customer II*, discovery has been completed and the defendants have moved for summary judgment. The plaintiffs are 15 unrelated companies that sell gasoline and diesel fuel, and operate primarily in the South and the Midwest. Each entered into one or two "flexie" contracts with MG Refining & Marketing, Inc. ("MGRM"), a Delaware corporation with offices in New York, Texas and Maryland. Alleging breach of contract, the plaintiffs have sued MGRM (now defunct), and also its parent corporation Metallgesellschaft Corp. ("MG Corp."), a Delaware corporation with offices in New York, and also MGRM's great-grandparent corporation, Metallgesellschaft AG ("MGAG"), a German corporation.

For the reasons set forth below, I recommend that Judge Marrero grant summary judgment against four of the 15 plaintiffs, namely Dalton Petroleum, Inc., RK Distributing, Inc., Merritt Oil Co., and Higginson Oil Co. I also recommend that Judge Marrero deny the motion of MG Corp. and MGAG for summary judgment on the issue of piercing the corporate veil.

## TABLE OF CONTENTS PAGE

PLAINTIFFS' FACTUAL STATEMENT......................................464

ANALYSIS............................................................470
1. The Cancellation and Release Agreements .......................470
2. Were Any of the Flexie Contracts Unlawful? ...................474
 a. RK Distributing, Inc. .....................................476
 b. Merritt Oil Co. ...........................................479
 c. Higginson Oil Co. .........................................481
 d. The Other Plaintiffs ......................................482
 e. The Argument that Some Flexies May Have Been Negotiated as Part of Larger Transactions ....................................482
 f. The Argument that Some Flexies May Have Been Exempt "Trade" Options.....483
3. To the Extent that Any of the Flexie Contracts Were Unlawful, May Any of those Customers Enforce Them? .........................483
4. To the Extent that MGRM Breached a Lawful Flexie Contract, Are MGRM's Parent and Great–Grandparent Nevertheless Entitled to Summary Judgment?.....488
5. The Plaintiffs' Expert Witnesses ..............................490

CONCLUSION AND RECOMMENDATION ....................................490

In the next several pages, I have copied (verbatim but in italics) plaintiffs' entire Factual Statement from pages 3–12 of Plaintiffs' 11/7/01 Memorandum, including its footnotes. Although argumentative in

tone, Plaintiffs' Factual Statement, as far as it goes, is based on evidence. However, it omits other evidence which is significant, and in some cases determinative, in particular, sworn statements by four of the plaintiffs which demolish their own claims. I will mention these in later sections of this Report. During my copying of Plaintiffs' Factual Statement, I will not intrude except for two footnotes marked with asterisks at pages 9 and 10.

## PLAINTIFFS' FACTUAL STATEMENT

### A. Parties

The 15 plaintiffs in this case are petroleum product marketers which sell gasoline and diesel fuel at the wholesale and retail levels.[1] These companies have, in common the fact that in the early 1990s they arranged to purchase fuel supplies from MGRM, a nationwide distributor and marketer of petroleum products. See MG Refining and Marketing v. Knight Enterprises, Inc., 25 F.Supp.2d 175, 177 (S.D.N.Y.1998). MGRM marketed petroleum products throughout the United States, delivering as many as 300,000 barrels (or 12.6 million gallons) of petroleum products a day through a terminal network with 165 locations in 42 states. MG Corp. Confidential Descriptive Memorandum, p. 3 (Pl.Exh. 1); Castle Prospectus, p. 21 (Pl. Exh. 2 (relevant excerpts only)); MG's Role In Energy In the U.S. ("MG's Role"), pp. 2–3 (Pl.Exh. 3).

MGRM was part of the MG Group, an international conglomerate headed by MGAG. MG's Role, p. 1 (Pl.Exh. 3); Taylor Dec., ¶ 3. MGAG claims to be one of the ten largest industrial companies in Germany and one of the world's leading developers and providers of risk management services. MG's Role, p. 1 (Pl.Exh. 3). MGAG operates in the United States as Metallgesellchaft Corporation ("MG Corp."), which offers no products or services on its own but instead serves as the umbrella organization for MGAG's United States operating companies; until 1996, one of those operating companies was oil distributor MGRM. Organization Chart for MG Capital and MG Corp., pp. xi and MGRM 8000745 (Pl.Exh.4).

### B. MGRM's Long–Term, Fixed–Price Contracts

With its extensive supply network extending all over the country (Benson Dep. Tr. 55–7), MGRM attracted customers to its petroleum marketing business by offering contractual arrangements that helped customers manage their inventories as well as the price risks inherent in their businesses. MG Corp. Confidential Descriptive Memorandum, p. 3 (Pl.Exh. 1); MG's Role, pp. 1–7 (Pl.Exh. 3); MG Energy, pp. 2–4 (Pl.Exh. 5). Highlighting its solid grounding in the physical market, including its offtake agreements with two refineries[2], MGRM offered protection from price volatility in the form of "next generation risk management tools." MG's Role, p. 3 (Pl.Exh. 3) (MGRM offered "customer-centered solutions"); MG Energy, pp. 2–4 (Pl.Exh. 5). In the early 1990's, MGRM focused efforts on market-

---

1. The initial paragraphs of the Customers' declarations contain descriptions of their businesses.

2. During the early 1990s, MG obtained a large portion of the product it supplied from two refineries, one the Indian Refinery in Lawrenceville, Illinois and one the Powerine Refinery in Santa Fe Springs, California. Castle Prospectus, p. 3 (Pl.Exh. 9). Pursuant to offtake agreements with these refineries, MGRM was obligated to purchase all refined products produced by these refineries through June 2000 (Indian) and January 1998 (Powerine). Id. During the early 1990s, these two refineries produced approximately 126,500 barrels (or approximately 5.3 million gallons) a day. Id. at 2.

ing to the retail sector, because it provided a "natural hedge" for MGRM's exposure due to its offtake agreements. *Business Plan, pp. 1, 13 (Pl.Exh. 6).*

During the early 1990s, MGRM's petroleum supply and risk management program was comprised of three types of long-term petroleum supply contracts: the guaranteed margin contract, the firm fixed contract or "ratable," and the 45–day contract or "flexie." *MG Corp. Business Review (Pl.Exh. 7).* These contracts were developed by MG and subjected to the scrutiny of in-house and outside regulatory counsel before they were offered to customers.[3] Under the guaranteed margin contract, MGRM supplied the participating customer a specified amount of gasoline or diesel fuel over a set period, with a price that would vary to ensure that the customer would be able to resell the product at retail at a nine cent margin. *Coleman Dep. Tr. 22; Ports Dec., ¶¶ 4–7.* The other two contracts—the ratable and the flexie—were fixed-price supply contracts. The ratable contract provided for monthly delivery of the contract's volume, apportioned "ratably" over the contract's five or ten-year term. *Ratable Contract, ¶¶ 1, 3 (Pl.Exh. 8).* The flexie differed from the ratable in that, unlike the ratable's monthly delivery schedule, the flexies allowed the customer to schedule delivery flexibly within the contract term. *Flexie Contracts, ¶ 2 (MG Exh. 1).*

Both the ratable contracts and the flexie contracts included a "cash-out" option, effective only if and when certain price conditions came into existence. Specifically, if during the term of the contract the price of petroleum futures on the New York Mercantile Exchange ("NYMEX") rose higher than the fixed price in the contract, the customer could cash-out its obligation to take delivery of part or all of the amounts remaining under the contract.[4] *Ratable Contract ¶ 16 (Pl.Exh. 8); Flexie Contract ¶ 16 (MG Exh. 1).* A customer electing to exercise the cash-out option in the flexie would receive a cash payment equal to the difference between the NYMEX price and the contract price, multiplied by the number of gallons to be cashed-out. *Id.* Although the option provision came into effect at lower prices under the ratable, the customer received only 50 percent of the cash-out amount. *Id.*

MGRM hedged its commitments under these contracts using a combination of over-the-counter derivatives, international futures trades, and futures trades on the NYMEX. *Benson Dep. Tr. 206–8; Memo from Drs. Neukirchen and Mertens to MGAG Supervisory Board (1/9/96) (Pl.*

---

**3.** William McCoy, at the time MG Corp.'s Vice President and Assistant General Counsel, drafted the templates for the flexie to conform to CFTC requirements and coordinated the legal review. *McCoy Arb. Tr. 3314–15; Cooper Dep. Tr. 89, 92, 99; Benson Arb. Tr. 9198–9200.* Moreover, outside counsel Kenneth Raisler (a partner at Sullivan & Cromwell and formerly the CFTC's General Counsel), independently concluded that MG's contracts were not illegal, off-exchange futures contracts. *Cooper Dep. Tr. 89, 92, 99, 329–30; McCoy Arb. Tr. 3315–16; Benson Arb. Tr. 9161, 9198–9200; McCoy Dep. Tr. 123–31.*

**4.** The cash-out option in the flexie contract (which is the same as the cash-out option in the ratable contract in all material respects) is found in paragraph 16, which reads as follows: At any time during the Term of this Agreement that the Fixed Cash Price is less than the bid price for the applicable NYMEX Futures Contract, ... Purchaser may, in lieu of accepting all or part ... of the remaining deliveries of Product, accept cash payments from Seller based on the average of bid prices obtained by Seller in totally or partially liquidating its long hedge positions for this Agreement (the "Average Bid Price") in the applicable Futures Contract.

*Exh. 10).* To implement its hedging strategy, MGRM sought the NYMEX's permission to exceed the position limits applicable to its trades. *Robertson Dep. Tr. 29–30; Kilduff Dep. Tr. 464.* In doing so, it represented that its futures positions were for the purposes of bona fide hedging, not speculation. *Id.; Benson Dep. Tr. 97–101.* In other words, it represented to the NYMEX that it was trading in futures to hedge legitimate contractual obligations—including its obligations under the flexies—to make physical deliveries of petroleum products. *Rieger Dep. Tr. 243–44; Robertson Dep. Tr. 29–30.* NYMEX granted MGRM's request only after receiving a guarantee from MGAG of all of MGRM's obligations in connection with its futures trades. *Guaranty, § 1.01 (Pl.Exh. 11).*

### C. MGRM's Business Relationships With Plaintiffs

In 1992 and the first half of 1993, twelve of the plaintiffs in this case entered into ratable contracts and several of them entered into guaranteed margin contracts and/or flexies. During the first half of 1993, however, market prices for petroleum products steadily declined, so that by June, prices were as many as 15 cents lower than those the customers were required to pay under their MG ratable contracts. *Merritt Dec., ¶ 10; Higginson Dec., ¶ 13; Weaver Dec., ¶ 16.* To help stem the Customers' losses, MGRM amended the ratables to give Customers a nine cent per gallon discount for 150 days in exchange for an agreement that the contract would automatically cash out and terminate if the NYMEX price reached a specified exit price. *Ratable Amendment (Pl.Exh. 12).* Thus, if and/or when the NYMEX price ever reached the amendment's exit price (usually in the low or mid 60s per gallon), the contract would terminate; the fixed-price monthly deliveries would stop; and the customer would have no remaining cash-out rights.

At around the same time, MGRM presented many of its customers with the opportunity to enter into 10–year flexies to complement their ratable contracts and other supply arrangements. *Letter from Schmitz to Van Manen (10/26/93) (Pl.Exh. 13); Weaver Dec., ¶¶ 20–21; Satterfield Dec., ¶¶ 17–19; Merritt Dec., ¶¶ 11–13; Higginson Dec., ¶¶ 14–16.* These flexies served as insurance policies: they provided protection from the supply shortages and dramatic price swings that jeopardized the ability of petroleum marketers to serve their customers and remain profitable. *Pl. Rule 56.1, ¶¶ 15–16, 27–28.* They guaranteed that product would be available in a tight market and gave customers the option of taking a cash payment as a way of cushioning the impact a price spike might have on their margins. *Id.*

### D. The MG Group's Financial Debacle

As the price of petroleum continued to decline throughout the latter part of 1993, MG was forced to pay hundreds of millions of dollars in margin calls on its futures contracts. *Yannazzo Dep. Tr. 48.* At this point, MGAG reviewed MGRM's hedging position and panicked. Seizing control over its U.S. oil business, it fired management at all three levels (MGAG, MG Corp., and MGRM), placing MGAG-directed personnel in charge of MG Corp. and MGRM. *Benson Dep. Tr. 256–57.* At the same time, MGAG ordered liquidation of MGRM's large hedge position. The removal of the hedges had grave implications for MGRM and, ultimately, MGRM's customers because the hedges were MGRM's source for the liquidity and supply MGRM needed to perform the long term, fixed-price contracts. *Benson Dep.*

Tr. 117–18, 121–22; Kremer Dep. Tr. (Susser v. Castle) 162.

### E. MGAG's Campaign to "Get Rid Of" The Flexie Contracts

MGAG also resolved at this time to "get rid of" the flexies. Nolting Arb. Tr. 1372–73. Investment Bank Gleacher (an MG consultant) recommended that "elimination [of the flexies] should be MG Corp.'s highest near term priority" and predicted that it could cost MG "$100 million in facilitating payments to the customers to get out of the [flexie] contracts." Gleacher Mem., p. 1 (Pl.Exh.14). [A]t around the same time, Morgan Stanley concluded that, while the ratable contracts were somewhat profitable to MG, the flexies overall had a negative value to MG of approximately $160.8 million. Morgan Stanley letter (1/24/94), p. 2 (Pl.Exh. 15). MG thus was in a "lose/lose" situation—the flexies not only represented an immense negative value to MG, but also were entirely unhedged, exposing MG to huge risk due to the possibility of a price spike which might prompt customers to demand delivery or cash out. Benson Arb. Tr. 9694–9700. The solution chosen by "new management": "eliminate[s] . . . the Firm Flexible [flexie] contracts." Rebuttal to Special Auditors' Report, at 68 (Pl.Exh. 16).

In January 1994, MGAG-retained Nancy Kropp oversaw an attempt to accomplish this "elimination" by way of unilateral "cancellation," but the efforts were unsuccessful. See, Judge Kaplan's March 30, 2000 Order denying MG's motion to dismiss in this case, 90 F.Supp.2d 401, 417.

### F. MGAG and MG Corp. Assure Customers of Their Backings

Subsequently, in early March 1994, MGRM's new President wrote each of the customers, "confirm[ing] [MGAG's] commitment to our business." Rodgers Letter (3/2/94), ¶ 15 (Pl.Exh. 17). MGAG sent its own letter "clarify[ing] MGAG's position with respect to MG Corp.'s and its subsidiary, MG Refining and Marketing's future in the petroleum supply and distribution business in the United States." Nolting Letter (3/1/94) (Pl.Exh. 18). It stated that it was "working with MG Corp. and its banks to conclude a long-term credit facility for MG Corp.," and that the "implementation of MGAG's and MG Corp.'s restructuring provides the financial resources for MG to continue to honor all contractual obligations." Id.; see also Letter from Rodgers to Ports (3/24/94) (Pl. Exh. 19). These assurances echoed the assurances MGRM's sales representatives had given the customers when first marketing the company's long-term petroleum supply agreements. Cowden Dec., ¶ 2; Weaver Dec., ¶ 4; Satterfield Dec., ¶ 8; Merrit Dec., ¶ 3; Gibbons Dec., ¶ 3.

The purpose of these assurances, of course, was that MGRM wanted the customers to continue performing under the ratables. See, Mastering of a Crisis (March 1995), p. 16 (Pl.Exh. 20); von der Heyden Dep. Tr. 302–03. The flexies, however, were a different story. Although MG also had contractual commitments under the flexies, the flexies, unlike the ratables, were not of "value to MG." Id.

### G. MGAG Implements Plan To Try To "Get Out Of" Flexies

In or about June 1994, the CFTC initiated an inquiry into some of MGRM's activities. Pantano Dec. ¶ 5 (MG Exh. 17). The investigation began merely as a request for information. Indeed, throughout the investigation, no complaint was ever filed; no enforcement order was ever entered; and MG was never formally charged with any violation of any law.

**468**

As early as October 1994, MGAG recognized that the CFTC inquiry offered possibilities for "getting rid" of the flexies. Minutes of October 25, 1994 Vorstand Meeting, p. 1 (English Translation) (Exh. 21). Using the CFTC proceedings as a mechanism for escaping MG's flexie obligations became a source of increasing interest to MGAG as negotiations with the CFTC progressed.

Paul Pantano, a Washington lawyer with extensive CFTC expertise, and his partner Joni Lupovitz, implemented the MG Group's response to the CFTC inquiry and conducted the negotiations. Pantano Dec., ¶ 2 (MG Exh. 17). A number of top-level MG Group management were directly involved in developing the strategy and directing Mr. Pantano's efforts, including Harald Reiger (then MGAG's General Counsel) and Arthur Taylor (MG Corp.'s General Counsel). Pl. Rule 56.1, ¶¶ 30–37. Accordingly, Mr. Reiger and Mr. Pantano were in close contact throughout the CFTC negotiations, exchanging more than 125 written communications and conducting numerous telephone conferences.[5] Id. ¶¶ 30, 32.

Consistent with their goal of jettisoning the flexies, one of the strategies they pursued was to preserve the ratables while abandoning any defense of the flexies. Even though Mr. Pantano conceded that the cash-out option in the ratable contract was "essentially the same" as the option in the flexie contract (Pantano Aff., ¶ 10), he expressly excluded the flexies from his formal submission to the CFTC. Letter from P. Pantano to CFTC (3/13/95) (Exh. 23). At the same time, he advanced the position that the ratable contract was a forward contract with an embedded trade option and thus exempt from the CEA. Id. The ratable contracts were the primary source of income for MGRM and a valuable outlet for the fuel MGRM was contractually obligated to purchase from the two refineries; the flexies, particularly with no hedges in place, were only a liability. Mastering of a Crisis, p. 16 (Pl.Exh. 20).*

MG went out of its way to ensure that the flexies would be deemed illegal and void by the CFTC. It even went so far as to propose that the final order "[d]iscuss how some sales presentations mentioned possibility of revising the arrangement if no price spike occurred during the contract term." MG Draft Consent Order (Exh. 24). In other words, it recommended misleading and inaccurate ** language in a blatant effort to heighten the CFTC's concern about the legality of the flexies, while at the same time defending the legality of the ratables. The CFTC duly included

---

5. *The MG Group's privilege log identifies over one hundred such communications. (Pl.Exh. 22). Earlier in this litigation, plaintiffs challenged some of MG's privilege designations on the grounds that the log's description did not appear to support the privilege claim. To resolve this challenge, Magistrate Judge Eaton conducted an in camera review of a select subset of the withheld documents, but there remain dozens of withheld communications which have never been reviewed by this Court.*

* This paragraph omits the difference between these two types of contract, which is crucial to the issue of whether they were lawful: The ratable contracts required monthly delivery of product and payment for product. Under the flexie contracts, the customer could postpone delivery for ten years, and could eliminate delivery if the market price rose above 62 cents per gallon at any time during those ten years.

** The quoted language was not inaccurate. Some of the salesmen and some of the customers stated that they had mentioned the possibility of "rolling over" or otherwise revising the arrangement if no price spike occurred during the ten-year term.

MG's proposed "finding" in the consent order. (MG Exh. 21).

As the negotiations were nearing their conclusion, they were addressed at the MG Group's highest levels. For example, the minutes of the Vorstand's May 8, 1995 meeting reference a formal resolution by the Vorstand deciding against payment of any CFTC fine exceeding $5 million. Protokoll (5/8/95), p. 9 (Pl.Exh. 25). Ultimately, tentative settlement terms were reached: the MG Group would pay a $2.25 million fine; the CFTC would "find" that the flexies were illegal and void; the ratables would remain in place; and the CFTC would terminate its investigation. Vorstand Chairman Neukirchen explained the Vorstand's decision as follows:

> It is obvious that for the new MGRM management these [flexie] contracts were unattractive. CFTC's decision made it possible to terminate these contract conditions with immediate effect.
>
> \* \* \* \* \* \*
>
> The conclusion of the settlement with CFTC was imperative for the MG Corp. Group. [ ] Under these circumstances, the Vorstand decided to empower MG Corp. to reach this settlement. We still believe that this was the right decision.

Neukirchen Memo to MGAG Supervisory Board (1/9/96), p. 2 (emphasis added) (Pl. Exh. 10). The CEO of MG Corp., Thomas McKeever, executed the consent order on July 27, 1995 (MG Exh. 21) and MG Corp. paid the fine. (Pl.Exh. 26).

After the consent order was finalized, MG quickly sent out form letters to flexie customers informing them that their contracts were "illegal and therefore void." (Pl.Exh. 27). The consent order attracted widespread criticism from the petroleum trade, the derivatives industry, and academics challenging the CFTC's overly expansive view of its own authority. The Wall Street Journal, for example, publish-

ed an op-ed by the Nobel Prize-winning economist Merton Miller and co-author Chris Culp in which they characterized the Consent Order as "egregious overreaching" and described the damage the Consent Order was causing in derivatives markets. Rein in the CFTC, August 17, 1995 (Pl.Exh. 28). The same day, the Wall Street Journal published its own editorial, noting that the flexies were "of a kind the marketplace had heretofore classed as outside the CFTC's reach" and that the Consent Order had "spooked" the swaps market. Swaps In Danger, August 17, 1995 (Pl.Exh. 29).

## H. Winding down and dissolution of MGRM

After MG signed the consent decree, fourteen customers (not the customers involved in the pending litigation) filed lawsuits, contending that MG had breached their flexie contracts. Within months of these filings—and with the Knight litigation against MGRM still pending—MGAG decided to dissolve MGRM altogether. Taylor Dec., ¶ 12. And before doing so, it stripped from MGRM its only asset—the hugely valuable two billion dollar net operating loss carryforward. Deutsche Bank Credit Report (Pl.Exh. 30); Pl. Rule 56.1 ¶ 45. These were MGAG's final touches on a strategy undeniably undertaken in an attempt to deny flexie customers any remedy for the breach of the flexies.

This ends the Plaintiffs' Factual Statement. The defendants offer a much different version; for a very limited sample, see MG Ex. 17 (Declaration of Paul J. Pantano, Jr., Esq., ¶¶ 8–9, 15–16) and MG Ex. 33 (Declaration of CEO Thomas A. McKeever, ¶¶ 4–5).

## *ANALYSIS*

### 1. *The Cancellation and Release Agreements*

In January and February 1996, eight of the plaintiffs signed Cancellation and Release Agreements prepared by MGRM. Copies appear at MG Ex. 25. The defendants assert that they are entitled to summary judgment against these eight plaintiffs, based on these Cancellation and Release Agreements. I recommend that summary judgment be granted, on this ground, against Dalton Petroleum, Inc. ("Dalton") only.

It is undisputed that Dalton's Cancellation and Release Agreement listed Dalton's flexie contract, and that Dalton's President knew this when he signed it. Nevertheless, he now asserts that he was misled. The President of Dalton, Neal A. Gibbons, Sr., submits his 11/2/01 Declaration, which says, in pertinent part:

11. Early in 1995, I became aware that the CFTC was investigating the legality of the 45 day contracts. Then, at the end of July 1995 we received a Telex from MG Refining and Marketing['s] President, David MacKenzie. (See, Attachment A). In the Telex, MG stated that the enforcement action by the CFTC had been settled, and that MG would pay a $2.[2]5 million fine. The MG Telex stated that, "This action in no way affects the validity of our Firm Fixed Price Agreements" (ratables). It was clear to me from the Telex that MG was telling me that the 45-day contracts [the flexies] were legally dead. I also recall talking with another MG customer who got a[n] MG Press Release saying that the CFTC had found the 45-day contracts were illegal and that MG would not perform under them.

12. In late 1995, Dalton signed a Release involving the ratable contracts. Under the Release, the monies due to Dalton under the ratable['s] [cash] blow-out provisions were netted-out against monies that MG said Dalton owed them. During the negotiations, which were handled by my attorney, Bob Bassman, MG wanted to include the flexies in the Release. I only agreed to do this because of MG's representation to me that the CFTC had said the flexies were legally dead and MG would not perform under them. I know now that the flexies are not legally dead, or void. I relied on MG's representation that the flexies were void when I approved the Release [which was signed by son Neal A. Gibbons, Jr.]. I would not have consented to include the flexie contract in the Release had I been aware of the truth.

MG's representation, as alleged by Dalton, was entirely true. The CFTC had indeed found "that the 45 Day Agreements are illegal, and therefore void." (MG Ex. 21, p. 7.) And MG had accurately stated that it would not perform under them. The cases cited at pages 70–71 of Plaintiffs' Memorandum are not on point, because Dalton has shown no deception. Moreover, Dalton's attorney and Dalton's President were specifically aware that Schedule A to the Cancellation and Release Agreement listed Dalton's two ratable contracts and also its flexie contract. Dalton has shown no good reason to resist summary judgment.

I turn now to the seven other plaintiffs who signed Cancellation and Release Agreements. In each of these agreements, the pertinent language is the same as in Dalton's, but Schedule A lists only the customer's ratable contract and not his flexie contract. These seven plaintiffs argue that their releases are ambiguous.

Back when this case was assigned to Judge Kaplan, the defendants moved for pre-discovery summary judgment as to four of these plaintiffs (Corbin Fuel, Ports

Petroleum, Ferrell Fuel, and Fox Fuel) based on the releases signed by them. Judge Kaplan denied summary judgment, and found that the defendants had not established that those four releases covered the flexies. His reasoning is equally applicable to the releases signed by Cary Oil, Higginson Oil, and Raymer Oil (which were apparently not mentioned to Judge Kaplan). Judge Kaplan wrote:

> ... The releases specify particular contracts to be canceled, which do not include the flexies, and then purport to release defendants from liability *for all claims against MGRM, "including without limitation"* any claim arising from the specified contracts. As no limitation is evident from the face of the releases, the MG Group argues that the releases reach more broadly than the specified contracts and release MGRM from all claims against it, including those brought in this case.

> Although plaintiffs do not dispute having signed the releases, they argue that the releases applied to specified contracts only and did not cover the flexies. They have submitted declarations by their principals to the effect that the releases were signed at MGRM's request in connection with the mutual cancellation of the contracts specified in each release and that they did not intend the releases to cover anything but those specified contracts. Further, plaintiffs attached to two of these declarations letters from MGRM to [Corbin Fuel and Ports Petroleum] which appear to have been enclosed with the releases and in which MGRM stated explicitly that the releases applied to the specified contracts.

> The New York Court of Appeals has noted that language of general release must be treated with particular care and must yield to the purpose for which the

release is given, the parties' intent and other attendant circumstances. As plaintiffs have submitted evidence that the parties did not intend a general release, the MG Group's motion for summary judgment on Counts I and II as against Corbin Fuel Co., Ports Petroleum Company, Inc., Ferrell Fuel Company Inc. and Fox Fuel Co. is denied.

*Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F.Supp.2d 401, 416 (S.D.N.Y.2000) (emphasis in the original, footnotes omitted). Judge Kaplan's ruling was made before any discovery was taken. Now that discovery has been completed, the defendants assert that these seven plaintiffs have insufficient evidence to raise a genuine issue for trial concerning the releases. I disagree.

The Second Circuit reversed a grant of summary judgment and held that a release was ambiguous in *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509 (2d Cir.2001) (decided shortly after the briefing of the instant motion). The plaintiff Bancorp sued the FDIC for, *inter alia*, "its actions relating to the closure of the Bank, including its sale of certain Bank assets for an amount far below ... value." *Id.* at 514. Yet Bancorp had signed a release in 1988, stating in part:

> [Bancorp] ... hereby releases the [FDIC], in its corporate capacity and in its capacity as receiver of the [Bank] ... (c) from any and all claims which Bancorp ... has or may have arising from or with respect to the decision of the Comptroller of the Currency to close the Bank on June 21, 1985.

*Ibid.* Applying New York law, the Second Circuit wrote, at 513 (all alterations made by the Second Circuit):

> ... see *Gross v. Sweet*, 49 N.Y.2d 102, 108, 424 N.Y.S.2d 365, 400 N.E.2d 306 (N.Y.1979) ("[A]n agreement [relieving] one party from the consequences of his

negligence ... must evince the 'unmistakable intent of the parties.' ") . . . . Moreover, because the "law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing]," a release which purports to excuse a party from responsibility for misconduct is subject to the "closest of judicial scrutiny." *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry,* 110 A.D.2d 343, 494 N.Y.S.2d 721, 723 (2d Dep't 1985)(citing *Gross,* 49 N.Y.2d at 106, 424 N.Y.S.2d 365, 400 N.E.2d 306).

The MG defendants have suggested that close scrutiny of a general release is appropriate only in non-commercial cases. (Reply Mem., p. 28, n. 33.) *Gross* and *Abramowitz* were non-commercial cases, yet the Second Circuit concluded that their language was applicable to *Golden Pacific,* even though (a) this was a commercial case, and (b) Bancorp signed the release after it had reason to know of the FDIC's alleged wrongdoing.

Applying the closest judicial scrutiny, the Second Circuit found the release agreement to be ambiguous, and therefore proceeded to "resort to extrinsic evidence to determine the parties' intent." (*Id.* at 517.)

In the case at bar, I find that the Cancellation and Release Agreements did not unambiguously release MGRM from the flexie contracts. Each agreement was drafted by MGRM. The structure of the agreement conveys the impression that what is being canceled is what is being released. It is undisputed that the cancellation paragraph (¶ 2) cancels only "the contracts identified on Schedule A attached hereto (the 'Contracts')." In each of the releases now under discussion, Schedule A identifies, in meticulous detail, one ratable contract only. (Cary Oil had two ratable contracts, and it is telling that

MGRM prepared two separate Cancellation and Release Agreements for Cary Oil on the same day.)

Later, we come to the paragraph (¶ 4 in some, ¶ 5 in others) which describes the release by the customer (the "Purchaser"). It contains eleven lines of typical general release language, but then it adds 13 words which are unnecessary and misleading if the intent is to release both the ratable and the flexie. These 13 words divert the reader's attention back to a specific ratable contract; they say: "including without limitation any Purchaser Claim arising from or related to the Contracts." "Contracts" was defined as those "identified on Schedule A" and, in each case, this was a single ratable contract. The draftsman, MGRM, now points to those two words "without limitation." I think "a reasonably intelligent person who has examined the context" (*Golden Pacific* at 516) might understandably read too quickly and assume that the words "without limitation" modify the phrase "arising from or related to." Even more confusion is created in the releases signed by Corbin Fuel, Higginson Oil, Ports Petroleum, and Raymer Oil. In those documents, the purchaser's release appears in ¶ 5, and finishes with 23 additional words:

> *provided that* this release and discharge shall not release, discharge, affect, impair, or waive any Purchaser Claim with respect to the Future Obligations.

*Lanni v. Smith,* 89 A.D.2d 782, 453 N.Y.S.2d 497 (4th Dep't 1982), refused to give effect to typical general release language which was followed by language similar to MGRM's. The Appellate Division wrote (with its emphasis in italics, and my emphasis in underlining):

> Smith and his passenger were injured .... Smith settled his personal injury case against GMC for $10,000 and gave a release to GMC, prepared by his per-

sonal attorney on a standard form which contained the usual printed terms covering all claims "for, upon or by reason of, any matter, cause or thing whatsoever, from the beginning of the world to the day of the date of these presents <u>and particularly, but without in any manner limiting the foregoing</u>, on account of," followed by a blank space. In the space in the form following the printed words there appeared the typewritten insert: "[on account of] *the personal injuries suffered by him* in the motor vehicle accident . . . ."

89 A.D.2d at 782, 453 N.Y.S.2d at 497–98. The court held, as a matter of law, that Smith was permitted to sue GMC for contribution arising out of the injuries sustained by his passenger, Patricia Lanni. See also *Herman v. Malamed,* 110 A.D.2d 575, 487 N.Y.S.2d 791 (1st Dep't 1985); 19A N.Y.Jur.2d, Compromise, Accord, and Release, § 87.

The flexie contract, by its terms (¶ 19(f)), could only be amended or waived by a writing "signed by the party to be charged with such amendment [or] waiver." If the parties intended to cancel the flexie contract, and to release each other from all obligations and claims under the flexie, then the straightforward thing to do would be to list the flexie on Schedule A. Moreover, each of the Cancellation and Release Agreements begins, at ¶ 1, with a dollar amount; it appears to be undisputed that this amount has nothing to do with the flexie contracts, but represents (a) payment of the cash "blow out" under the ratable contract, minus (b) whatever monies the customer owed for previous deliveries under the ratable contract.

MGRM's Director of National Accounts sent Ports Petroleum a cover letter saying, "Per your conversation with Steve Meeds, please find enclosed 2 copies of the cancellation and release agreement for contract # 284c2530," specifying solely the ratable contract. (MG Ex. 26.) Twelve days later, MGRM's Director of Wholesale Marketing sent an almost identical cover letter to Corbin Fuel. (MG Ex. 27.) A reasonable jury could find that MGRM sent similar cover letters to Ferrell Fuel, Fox Fuel, Cary Oil, Higginson Oil, and Raymer Oil, specifying only the ratable contracts.

Finally, I think it is appropriate to consider Dalton's release when construing the releases signed by the seven other plaintiffs. "New York law, which is applicable in this diversity action, requires that all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties." *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir.1965). In *Gordon,* the Second Circuit reversed summary judgment and wrote, at pages 263–64:

> The language of the March 11, 1931 release is broad, but when taken in the context of all three agreements its meaning is not clear. Vincent Youmans, Inc. released Mack Gordon 'from all manner of action and actions * * * covenants, contracts * * * from the beginning of the world to the day of the date of these presents.' . . . . However, the assignment, also signed on March 11, between Gordon and Miller Music Corporation recited: 'the Authors were heretofore under contract to Vincent Youmans, Inc. in respect to the foregoing musical numbers listed in Schedule A, from which contracts the Publisher had obtained releases for the Authors . . . .'
>
> \* \* \* \* \* \*
>
> Here, the recital in the contemporaneous assignment casts doubt upon the purpose and meaning of the re-

lease.... It seems not unlikely that the assignment indicates that the broad language of the release was mere boiler plate. One might reasonably conclude that the parties intended to limit the release to the compositions listed on Schedule A [of the assignment].

In *Gordon*, Vincent Youmans, Inc. signed the release to Gordon, but was not a party to the assignment from Gordon to Miller Music. In the case at bar, MGRM prepared a release by Dalton Petroleum, and then prepared releases by the seven other customers. The release by Dalton was dated a few days earlier than the releases by the seven others, and its Schedule listed Dalton's flexie. MGRM certainly knew this, and the seven others apparently did not know this. One possible rational inference would be that MGRM appreciated that it was doing something different a few days later, when it did not list the flexies on the other releases. MGRM alleges that it was Dalton's idea to list the flexie, but Dalton swears that it was MGRM's idea; MGRM proffers its internal e-mail, which does not resolve this dispute but does show that MGRM was talking as early as December 26, 1995 about listing the flexie. (Docket Item # 125, Taylor Decl. ¶ 16 and annexed 12/26/95 e-mail; Docket Item # 132, Decl. of Dalton's Gibbons ¶ 12.) If the jury were to believe Dalton, it might conclude that MGRM suggested in some veiled manner to various customers that the flexie be listed, and Dalton was the only one who expressed any willingness to agree to this.

If Judge Marrero agrees with me that the scope of the Cancellation and Release Agreement is ambiguous, then the jury "may resort to extrinsic evidence to determine the parties' intent." *Golden Pacific*, at 517; that was a non-jury case, but in a jury case the jury will decide "the question of the meaning of a release [that is ambiguous]." *Bank of America N.T.S.A. v. Gillaizeau*, 766 F.2d 709, 714 (2d Cir.1985), citing *Ehrlich v. Abrams Instrument Corp.*, 53 A.D.2d 825, 385 N.Y.S.2d 299 (1st Dep't 1976).

For the reasons stated in this Section 1, I recommend that Judge Marrero deny summary judgment on the defense of release as to all plaintiffs except Dalton Petroleum.

### 2. *Were Any of the Flexie Contracts Unlawful?*

The First Amended Complaint listed 17 plaintiffs, but Guttman Oil Co. and Abbott Oil Company, Inc. were dismissed on January 4, 2001. Having recommended summary judgment against Dalton, I turn now to the remaining 14 plaintiffs. Nine of them had one flexie contract each, and five of the plaintiffs had two flexie contracts each. These contracts are described in the 5/25/99 First Amended Complaint at ¶¶ 39–48, 50–53, and 55–59.

I must pause here to deal with Wise Oil & Fuel, Inc. The First Amended Complaint at ¶ 47 alleged that Wise had one flexie contract, for the relatively small amount of 2,000,000 gallons over a period from September 1993 to August 1998. (Although ¶ 47 misstated the date of execution and the nature of the product, it is undisputed that the contract is accurately reproduced as the last portion of MG Ex. 1.) Wise now says that it had a second flexie contract, for 21,000,000 gallons over a ten-year period; it says that, at some time in the future, it "will move [for leave] to amend its Complaint to add this flexie contract." (Pls. 56.1 St. ¶ 1.) I recommend that Judge Marrero deny leave to amend, because Wise is unable to overcome the statute of frauds. See New York General Obligations Law § 5–701(a). Wise does not claim that MGRM ever signed any

document reflecting this alleged ten-year contract. His 11/02/01 Declaration (the last one in Docket Item # 132) says that he made an oral agreement with MGRM salesman John R. Patrick and sent him the following letter on September 24, 1993:

Dear John,

This letter shall serve as our commitment for MG Refining and Marketing Inc. to purchase on behalf of Wise Oil Co., up to 21,000,000 gallons of Diesel Fuel at $.6200 per gallon in accordance with the MG Refining and Marketing Inc. 45 Day/10 Year contract.

Product will be suitable for road use at time and place of delivery if applicable.

This commitment is valid until December 31, 1993.

Sincerely, Bill Wise.

Wise's offer evidently expired without any formal acceptance by MGRM. Accordingly, Wise's claim is limited to the five-year flexie for 2,000,000 gallons.

Long before the case at bar was filed, several other "flexie" customers (unrelated to those in our case, but also represented by William H. Bode, Esq.) brought actions against MGRM which were consolidated in 1996 with *MG Refining & Marketing, Inc. v. Knight Enterprises, Inc.*, 94 Civ. 2512(SS), sometimes known as *Customer I* and generally cited in this Report as *MG Refining*. In 1997, Judge Sotomayor ruled that, although the CFTC Order declared the flexies "illegal, and therefore void," the customers were not collaterally estopped from arguing that the flexies were lawful. *MG Refining*, 1997 WL 23177, * 3–4 (S.D.N.Y. Jan. 22, 1997).

In 1998, after some discovery had occurred, Judge Sotomayor wrote a lengthy opinion about whether the flexie contracts were unlawful. *MG Refining*, 25 F.Supp.2d 175, 180–88 (S.D.N.Y.1998). Except for one question (which I will dis-

cuss later), she said that she "might be inclined to grant MG's motion against most of the Customers in this case [*Customer I*]." *Id.* at 185. I shall now set forth a very condensed version of her analysis.

She began with § 4(a) of the Commodity Exchange Act, 7 U.S.C. § 6(a), which declares, in pertinent part:

Unless exempted by the Commission pursuant to subsection (c) of this section, it shall be unlawful for any person to offer to enter into, [or] to enter into ... a contract for the purchase or sale of a commodity for future delivery ... unless ... such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commodity Futures Trading Commission as a "contract market" for such commodity ....

It is undisputed that none of the flexie contracts was "conducted on or subject to the rules of a board of trade." Thus the key issue is whether one or more of the flexie contracts was exempted by the Commission, or was not a contract for "future delivery."

Judge Sotomayor quickly rejected the suggestion that the "trade option" exemption or the "swaps" exemption might apply to the flexies. 25 F.Supp.2d at 181. This left only the "forward contract" exception, which was formerly set forth in 7 U.S.C. § 2 and, since October 1992, has been set forth in 7 U.S.C. § 1a(11): "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery."

She then reviewed *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 579 (9th Cir.1982), which said (with my emphasis):

[T]he exclusion for sales of cash commodities for deferred shipment or delivery .... is unavailable to contracts of sale for commodities which are sold merely for speculative purposes and

which are not predicated upon the *expectation* that *delivery* of the actual commodity by the seller to the original contracting buyer will occur in the future.

She then considered the CFTC's 1990 Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. 39188, and also *In re Bybee*, 945 F.2d 309 (9th Cir. 1991), and found that they did not change the test set forth in *Co Petro*. Rejecting the customers' arguments, she wrote:

> The underlying purpose of a transaction is, however, still the touchstone of the forward contract analysis. *See, e.g., CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772–73 (9th Cir.1995); *CFTC v. Standard Forex*, 1996 WL 435440, at * 10 (E.D.N.Y. July 25, 1996) (Sifton, C.J.).

(*MG Refining*, 25 F.Supp.2d at 184.) After reviewing the depositions in that case, Judge Sotomayor wrote:

> [T]his Court doubts that a reasonable juror could infer from the present record that the Customers ever proposed to take delivery under the terms of the flexies themselves.

(*Id.* at 187.)

In the case at bar, I find that no reasonable juror could find that RK Distributing, Merritt Oil or Higginson Oil entered into their flexie contracts "predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer w[ould] occur in the future." *Co Petro*, 680 F.2d at 579. On the contrary, their underlying motivation was speculation; they intended to "blow out" these contracts by obtaining one or more cash payments during times when the price of gasoline and diesel fuel spiked, and it was highly likely that these prices would spike during the next five or ten years. During the five-year period immediately preceding the marketing of the flexies, the relevant NYMEX price exceeded the blowout price 33 times for gasoline and 11 times for diesel fuel. (Defs. 56.1 St. ¶ 7, citing MG Ex. 2 ¶¶ 13–15.)

Before describing the evidence with respect to each of these three plaintiffs, I pause to discuss the decision of Administrative Law Judge Bruce C. Levine in *In the Matter of Cargill, Inc.*, 2000 WL 1728291 (C.F.T.C. Nov. 22, 2000). Plaintiffs' brief, at page 28, suggests that *Cargill's* reasoning may undermine Judge Sotomayor's 1998 opinion. I disagree. *Cargill* involved a grain purchase agreement consisting of a typical "forward" contract for deferred delivery, plus an addendum offering a premium price. But the addendum could go into effect only if the seller made an *extra* delivery. By contrast, in our case, the cash blow-out went into effect as a substitute for delivery.

### a. *RK Distributing, Inc.*

Plaintiff RK Distributing's case is a sure loser in view of the 8/2/95 declaration of its President Thomas Cowden (MG Ex. 3), which he confirmed as true and correct at his 9/13/00 deposition at Tr. 156–61. RK Distributing never had a ratable contract with MGRM, and never took delivery of any product from MGRM. It entered into one flexie contract. Under penalty of perjury, Mr. Cowden declared:

1. I am the President of RK Distributing, Inc., 1001 West Memorial Road, Oklahoma City, Oklahoma, 73156.

2. RK Distributing, Inc. ("RK") is in the business of selling gasoline both at retail and for resale. RK sells approximately 15–18 millions of gasoline per year, with approximately 25–30% of this business in retail sales.

3. In September 1993, I met with a salesman from MG Refining & Marketing ("MGR & M") named DeWayne

Tomlinson. RK had not purchased anything from MGR & M in the past and this was the first time that I met Mr. Tomlinson.

4. Mr. Tomlinson presented several marketing programs to me at this meeting, among them · a contract called a Firm Fixed Price 45 Day Agreement [the formal name of the "flexie"] under which RK could contract to purchase gasoline from MGR & M over a ten-year period at a fixed price of 62 cents per gallon. Mr. Tomlinson explained that under this contract, RK could defer taking any delivery of gasoline until the end of the tenth year and that, under an option provision of the contract, in the event that the market price of gasoline spiked above 62 cents during the ten-year period, RK could at that time take 100 percent of the profit above the contract price on the remaining volume of gasoline under the contract without taking any delivery of gasoline.

5. The option provision of the contract was very attractive to me. I saw the contract not as an avenue to take delivery of gasoline, but as a speculative investment or gamble that the market price of gasoline would rise above 62 cents. Consequently, though I subsequently entered into a Firm Fixed Price 45 Day Agreement with MGR & M (dated September 30, 1993), which called for RK to purchase 42,000,000 gallons of gasoline, I had no intention of taking delivery of 42,000,000 gallons and, in fact, did not have the capacity to take delivery of this much gasoline.

6. Having been in the oil business for 25 years, when I entered into this contract I recognized that it was very likely that the market price for gasoline would spike above 62 cents sometime during the ten-year term and, therefore, that I would not be required to take any delivery of any gasoline under the contract. I had seen the price go above 62 cents before and was aware of how volatile the market is.

7. Further, Mr. Tomlinson told me that if the ten year term was coming to an end and there had been no spike in the market price, RK would not have to take delivery of the 42 million gallons under contract but, instead, MGR & M would do another five-year deal or, in other words, roll-over the contract for another five years. I asked Mr. Tomlinson to put this in writing but he said he could not do so. Mr. Tomlinson also told me that under the contract, RK would not be responsible for any margin calls.

8. I never took any delivery of gasoline under the contract and, in January 1994, agreed with MGR & M to cancel this contract.

Five years later, at his September 2000 deposition, Mr. Cowden was taken through the pertinent language in Paragraphs 4 through 8 of his declaration, and each time acknowledged that it was true. He modified his declaration only with respect to one unusual possibility. He testified, in essence, that if the supply of gasoline became so tight that he had no other source, he would have taken gasoline from MGRM to supply his customers, rather than simply taking the cash (which would have been a temptingly huge amount if the supply were to become so tight). See his deposition at Tr. 190 and 245:

Q [Y]our expectation was that it [the price] would spike, wasn't it?

A That was half of the program, but I had been through two product shortages in my business when gasoline was not available and this product looked very enticing to me in a tight situation.

\*　\*　\*　\*　\*　\*

Q Under what circumstances were you planning to take delivery?

A [If] The product got short.

Except for this one remote possibility, he made no modification, during the discovery period, to his declaration's detailed revelation of his motivations for entering into the flexie contract. After discovery closed, and after the defendants moved for summary judgment, Mr. Cowden belatedly attempted to modify his declaration a bit more. His 11/1/01 declaration, at ¶ 4, says:

On August 2, 1995, I signed a Declaration prepared by MG's attorney in connection with the Benson Arbitration proceeding. The Declaration overstates what were the facts, and is internally inconsistent. I state in the Declaration that I saw the 45 day contract as a "speculative investment." What I meant is that it was a business investment—similar to an insurance policy—which either paid-off or not depending upon future market conditions. If market prices spiked like I expected, there was very little "speculation" in the contract, and a lot of investment. . . .

Mr. Cowden is playing on words. He made no "investment" of money. He did sign a contract that said he would purchase gasoline at an indefinite time or times during the next ten years, at a fixed price of 62 cents per gallon, a price that was higher than the market price at the signing date. But he expected that the price would spike above 62 cents. His recent statement does not quote the entire sentence from his 1995 declaration, a sentence which he testified at Tr. 157 to be true and correct: "I saw the contract not as an avenue to take delivery of gasoline, but as a speculative investment or gamble that the market price of gasoline would rise above 62 cents." Even though he believed that such a price spike was a "sure thing," his behavior is properly

called speculation, because his purpose was to obtain cash from market fluctuations. In essence, he has answered "yes" to the question Judge Sotomayor posed as the test of unlawfulness:

Were the flexies entered into by [a] commercial dealer[ ], who w[as] primarily in the business of buying and selling petroleum, but who w[as] also willing to seize on the opportunity to speculate on an unregulated futures market price, thereby obtaining a second source of income?

(25 F.Supp.2d at 188.) Mr. Cowden ignores this jugular issue, and instead focuses on the capillaries; his 11/1/01 declaration goes on to say, still at ¶ 4:

. . . My [1995] Declaration also states that Mr. Tomli[n]son said that if the price did not spike, I could roll-over the contract for 5 more years. But as I further state, Mr. Tomli[n]son refused to put this in writing. As a businessman I know that his off-hand remarks had no legal significance without a written contract. I knew if prices did not spike, and I had not taken any deliveries by the end of the 10–year period, that I would be legally obligated to take delivery. Finally, the Declaration states that I did not have the capacity to take delivery. That is true in the sense that, like most petroleum jobbers, I do not own a petroleum terminal. The statement, however, is incomplete because I could readily contract for storage for the entire contract volume of 42 million gallons. (In practice, I would have taken deliveries well prior to the end of the contract, rather than all at once). . . .

The last sentence is certainly true if we change the word "would" to "could" (which is the verb used in the previous sentence, and three more times in the next few sentences). But any attempt to say that he "would" have taken delivery is a blatant

contradiction of the record he made prior to the close of discovery. Even if Judge Marrero were to allow a jury to hear this belated version, any reasonable jury would find that Mr. Cowden has presented no rational explanation to undermine his 1995 declaration about his state of mind:

> The option provision of the contract [the option of taking cash "without taking any delivery of gasoline"] was very attractive to me. I saw the contract not as an avenue to take delivery of gasoline .... I had no intention of taking delivery of 42,000,000 gallons ....

(MG Ex. 3, ¶ 5.)

I now move on to consider Merritt Oil Co. and Higginson Oil Co. The evidence of their underlying purpose is very similar to the evidence of RK Distributing's purpose. It is true that Merritt and Higginson had ratable contracts with MGRM and therefore, unlike RK, they were taking monthly delivery of some product from MGRM. However, the evidence shows that their purpose in entering into their flexie contracts was to take the cash blow-out, and not to take delivery of product.

b. *Merritt Oil Co.*

Merritt Oil, located in Mobile, Alabama and 50–percent owned by Richard T. Merritt, was and is in the business of selling gasoline and diesel fuel. "In 1993, our total sales volume was about 18 million gallons ...." (10/23/01 Declaration of Mr. Merritt, ¶ 2.) In late 1992, Merritt entered into two ratable contracts with MGRM, one running from 6/1/93 to 3/31/03 and totaling 5,040,000 gallons of gasoline, and the second running from 9/1/93 to 8/31/03 and totaling 10,080,000 gallons of diesel fuel. In 1993, Merritt entered into two additional ratable contracts with MG, the third running from 11/1/93 to 10/31/03 and totaling 5,040,000 gallons of diesel fuel, and the fourth running from 4/1/94 to 3/31/04 and totaling 10,080,000 gallons of gasoline.

(Id. at ¶ 9; MG Ex. 16.) These four ratable contracts obligated Merritt to take delivery, on a monthly basis, of unbranded product that each year would total slightly more than 3,000,000 gallons—one-sixth of its total 1993 volume, and more than one-third of its total 1993 unbranded volume. (Merritt's volume was mostly branded; 10/31/01 Decl. of Mr. Merritt, ¶ 1.)

On top of these four ratable contracts, Merritt entered into two huge flexie contracts in September 1993. (MG Ex. 1.) They each ran from 4/1/94 to 3/31/04. One flexie called for 84,000,000 gallons of unbranded gasoline, and the other called for 84,000,000 gallons of unbranded diesel fuel. Even if Merritt were to spread the deliveries equally among each of the ten years, this would mean that each year it would have to pay for 16,800,000 gallons of unbranded product under the flexies, plus 3,000,000 gallons of unbranded product under the ratables. Yet its 1993 unbranded volume was less than 9,000,000 gallons.

In 1995, Mr. Merritt gave a sworn declaration in the arbitration between MGRM and MGRM's ousted president. (MG Ex. 4.) It is essentially the same as the declaration given by Mr. Cowden of RK Distributing, but the details are different. I will quote the following excerpts:

> 3. In September 1993, I met with a salesman from MG Refining & Marketing ("MGRM") named John Nash, Jr.....
>
> 4. .... Unlike the Firm Fixed contract, Mr. Nash said that Merritt Oil would probably never have to take delivery under the 45 Day contract. He further explained that under this contract, if the market price of gasoline went above 62 cents at anytime during the ten-year term of the contract, Merritt Oil could sell the contract and take 100 percent of the profit above the contract price....

6. .... I fully expected the price to spike above 62 cents sometime in the ten years. Mr. Nash presented the 45 Day contract to me as a hedge or speculative investment—the market price was likely to rise above 62 cents, so Merritt Oil would never have to take delivery under the contract and could make a lot of money.

8. In entering into these contracts, I explained to Mr. Nash that if the price did not go above 62 cents, Merritt Oil would have a very difficult time taking delivery of the amount of gasoline that I was contracting for (84,000,000 gallons) because this volume was more than our un-branded sales (and, of course, I could not sell this product at our branded outlets). Mr. Nash responded that if that occurred (i.e., the price did not spike), he would "work something out." He did not specify how he would work this out, but I had no reason not to believe that what Mr. Nash was saying was true.

9. I am aware that as a rule of thumb in my business, you should not make a long-term contract for more than ten percent of your un-branded volume.... I did not follow this standard when Mr. Nash presented me with the 45 Day contract because I fully expected the market price to go above 62 cents, so that I would never have to take delivery under the contract.

(MG Ex. 4.) This last sentence was read to Mr. Merritt at his 6/20/00 deposition at Tr. 174, and he conceded, "That was my thoughts at that time." By contrast, earlier in his deposition, at Tr. 28, he asserted, "We entered into the contract knowing that we were going to take that product." But that assertion was undone when he was confronted with his own September 1993 note:

Q Then you wrote ["]if the price on the MERC goes over 62 cents they will sell within 45 days and each penny is worth $840,000 to us.["] What did you mean when you wrote "each penny is worth $840,000 to us"?

A Each penny over our contract price[,] if we chose to sell out of the contract rather than pull the product.

Q And then you wrote, "We don't ever pull any product," right, that's what you wrote there? That was based on what you and Mr. Nash had discussed about this contract, correct?

A That says *we don't ever pull any product.* This is simply a note on a portion of an explanation of this contract, the option of selling out of it or cashing out, whatever you want to call it. (6/20/00 deposition of Mr. Merritt, Tr. 178, with my emphasis.)

Mr. Merritt's handwritten note (MG Ex.34) shows what was important to him in September 1993. It corroborates his 1995 declaration that he "fully expected the market price to go above 62 cents, so that I would never have to take delivery under the contract." No reasonable jury could find that Merritt's purpose was to take delivery of these huge volumes of unbranded product, which vastly exceeded his 1993 unbranded sales volume.

After discovery closed, Mr. Merritt submitted his 10/31/01 declaration, mentioning some unlikely hypotheticals:

15. ... But in some circumstances, I would have wanted to take delivery. As an example, sometimes the local rack prices are actually higher than the NY-MEX prices, and when this happened, it would be more desirable to take physical barrels than cash out.

\* \* \* \* \* \*

17. ... If the market price ever exceeded the contract price, however, it

would have been easy for me to sell the entire contract volume. New and existing customers would have lined up for the chance to buy fuel at below-market prices, and I would have been able to resell the product in a variety of ways, particularly if I engaged the help of a broker or dealer.

But the flexie contracts provided that the customer could not take physical barrels for 45 days after he gave notice to MGRM. During that time, the market price might well fluctuate. And if Mr. Merritt undertook "to sell the entire contract volume," he would tend to drive the market price down. If, instead, he exercised the cash-out option, MGRM would not delay for 45 days, but would act quickly to lock in his profit, as required by Paragraph 16(a) of the flexie contract:

> ... At any time that [Merritt] exercises this [cash-out] option, [MGRM] shall, as soon as practicable after receipt of telephonic notice of such election, liquidate the long hedge positions to the extent of the number of contract units that is equivalent to the number of gallons with respect to which [Merritt] has exercised the option.

c. *Higginson Oil Co.*

Kim Wayne Higginson was Vice President, and is now President, of Higginson Oil Company, a petroleum wholesaler and retailer in Mackey, Indiana. In February 1992, Higginson Oil and MGRM entered into a one-year "guaranteed margin" contract, later extended into January 1994. (10/31/01 Higginson Decl. ¶ 9.) This contract apparently was for gasoline, and it did not have a cash blow-out option. In January 1993 Higginson Oil and MGRM entered into a ratable contract for delivery of diesel fuel for ten years beginning in September 1993, at an annual rate of 903,-000 gallons. (Id. ¶ 12; MG Ex. 16.)

In 1995, Mr. Higginson gave a sworn declaration in the arbitration between MGRM and MGRM's ousted president. (MG Ex. 6.) It described his motivation for entering into a flexie contract for 63,000,-000 gallons of gasoline in September 1993:

> 4. Mr. Gelvin presented the 45 Day contract to me as one under which it was not likely that I would ever have to take delivery of gasoline. His emphasis and primary selling point was the likelihood that the market price of gasoline would rise above 62 cents, and therefore that there would be no obligation to take any delivery under the contract.

> \* \* \* \* \* \*

> 6. Based on Mr. Gelvin's representations regarding the 45 Day contract, as well as Mr. Lecompte's earlier presentation of numbers showing the history of pricing, and my own experience in the business, I felt certain that the market price of gasoline would rise above 62 cents sometime during the term of the 45 Day contract. Therefore, I entered into a 45 Day contract with MGR & M (dated September 15, 1993) for Higginson Oil to purchase 63,000,000 gallons of gasoline at $.6200 per gallon.

> \* \* \* \* \* \*

> 9. In January 1994, I agreed on behalf of Higginson Oil with MGR & M to cancel this contract.

At his 7/5/00 deposition, at Tr. 137, Mr. Higginson reaffirmed the correctness of Paragraph 4; he was apparently asked about the other paragraphs, but I do not have those pages of the transcript. He now makes a minor change to Paragraph 6: "I, too, thought it likely (in a previous affidavit drafted by a[n] MG lawyer, I said I was 'certain,' but that word is really too strong) that the price would rise above the contract price." (10/31/01 Higginson dec-

laration ¶ 20.) He goes on to repeat the same hypothetical given by Mr. Merritt:

> If the market price ever exceeded the contract price, it would have been easy for me to sell the entire contract volume. New and existing customers would have lined up for the chance to buy fuel at below-market prices, and I would have been able to resell the product in a variety of ways, particularly if I engaged the help of a broker or trader.
>
> ... We could have financed through any one of dozens of refiner-suppliers, pipelines, or through established financial institutions.

(*Id.* ¶ 21–22.) No reasonable jury could believe this hypothetical. If Higginson purchased "the entire contract volume" of 63,000,000 gallons, it would have owed MGRM $39,060,000—compared to Higginson's assets of roughly $1,000,000, net income of $33,000 in 1992, and a negative book value in 1993. (*Id.* ¶ 8; MG Ex. 2 at p. 11; Docket Item # 137, 11/26/01 Supp. Aff. at Exh. A.) Also, anyone thinking of lending money to Higginson would realize that Higginson had to wait 45 days for delivery of product and had to bear any drop in the market price during those 45 days.

In short, any reasonable jury would find that Higginson's underlying motivation for entering the contract was to exercise the cash blow-out. The expectation of both parties to the contract was "that the market price of gasoline would rise above 62 cents, and therefore that there would be no obligation to take any delivery under the contract." (8/14/95 Higginson Decl. ¶ 4.) Higginson's flexie contract was unlawful under the *Co Petro* test quoted by Judge Sotomayor: This contract was "not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 579 (9th Cir.

1982), quoted in *MG Refining*, 25 F.Supp.2d 175, 182 (S.D.N.Y.1998).

### d. *The Other Plaintiffs*

In contrast to RK Distributing, Merritt Oil and Higginson Oil, the other plaintiffs apparently were much more guarded in describing their motivations and the conversations they had with the salesmen about the flexie contracts. I think several of these other plaintiffs will have a difficult task to show that they contemplated taking delivery, especially M.M. Satterfield Oil Co., Inc., a very small company which signed two flexies for a total of 126,000,000 gallons, second only to Merritt Oil among all the plaintiffs. Nevertheless, I cannot say that the evidence concerning the motivations of these other plaintiffs is so one-sided as to call for summary judgment.

### e. *The Argument that Some Flexies May Have Been Negotiated as Part of Larger Transactions*

In *Customer I*, discovery was never completed. Judge Sotomayor denied summary judgment in order to allow those plaintiffs to attempt to flesh out "evidence that the flexies may have been negotiated as part of larger transactions, which included the sale not only of flexies but of certain ratable contracts." *MG Refining*, 25 F.Supp.2d at 187.

That one possible twist cannot salvage the claims of RK Distributing, Merritt Oil or Higginson Oil. RK Distributing's flexie was its only transaction with MGRM—it simply never had a ratable contract with MGRM. (Def. 56.1 St. ¶ 23.) Higginson Oil had one ratable and one flexie, but they were for different products—a ratable for 9,030,000 gallons of diesel fuel, and a flexie for 63,000,000 gallons of gasoline. (See MG Ex. 16, prepared by plaintiffs.) Merritt Oil did have ratables and flexies for

both products, but Mr. Merritt testified as follows:

Q When the flexies were being marketed to you, were they being marketed to you as part of any other contracts that MG was offering?

A As part of?

Q Or did they stand on their own?

A They had nothing to do with any of the contracts that I was aware of.

Q When you said that the flexie contracts could be regarded as a hedge, was there any specific product that you had sold that the flexie would be a hedge against?

A No.

(6/20/00 Merritt Depo. Tr. 221–22.) .

f. *The Argument that Some Flexies May Have Been Exempt "Trade" Options*

Plaintiffs' 11/7/01 Memorandum, at pages 38–39, argues that, even if the flexies are not exempt "forward" contracts, perhaps they were exempt "trade options." Judge Sotomayor held that the flexies "cannot be considered options at all," 25 F.Supp.2d at 181, but plaintiffs say maybe they can be if one views them as "hybrids." The next step is an unattractive argument that "there is at the very least a disputed issue as to the reasonableness of *MG's* beliefs when it marketed the contracts." (Pls. Mem. at 39, emphasis added.) Thus, for example, if RK Distributing duped MGRM, the flexie might still be lawful if it was "offered by a person which has a reasonable basis to believe that the . . . commercial user or merchant . . . enters into the commodity option transaction solely for purposes related to its business as such." (17 C.F.R. § 32.4(a), quoted in full at Pls. Mem. at 38.) The last nine words in that regulation have a very narrow meaning when applied to gasoline merchants; see 17 C.F.R. § 1.3(z)(2)(ii)(A) and

(B), quoted in the 11/26/01 Reply Mem. at 17 n. 17. In any event, the 1995 declarations of the principals of RK Distributing, Merritt Oil and Higginson Oil describe their conversations with MGRM salesmen, and make it obvious that those salesmen knew that, at least as to those three customers, the flexies were not being entered into for purposes of delivery of product. The salesmen's knowledge is imputed to MGRM. Therefore, as to those flexies, MGRM could not have a reasonable basis for any belief such as described in 17 C.F.R. § 32.4(a).

For the reasons stated in this Section 2, any reasonable jury would find that the flexie contracts involving RK Distributing, Merritt Oil, and Higginson Oil were unlawful under 7 U.S.C. § 6(a).

**3. *To the Extent that Any of the Flexie Contracts Were Unlawful, May Any of those Customers Enforce Them?***

In *Customer I,* the customers did not dispute that the flexie contracts would be unenforceable to the extent that they were unlawful. *MG Refining,* 1997 WL 23177, * 2–3. In the case at bar, however, the customers argue that each flexie contract is enforceable regardless of its lawfulness. At the summary judgment stage, I have found that the flexie contracts entered into by three of the customers were unlawful. I shall now discuss whether any of those three customers may nevertheless enforce the unlawful contracts.

The Restatement (Second) of Contracts provides as follows at §§ 178, 180:

§ 178. When a Term is Unenforceable on Grounds of Public Policy

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

§ 180. Effect of Excusable Ignorance

If a promisee is excusably ignorant of facts or of legislation of a minor character, of which the promisor is not excusably ignorant and in the absence of which the promise would be enforceable, the promisee has a claim for damages for its breach but cannot recover damages for anything that he has done after he learns of the facts or legislation.

"The strength of the public policy involved is a critical factor in the balancing process." *Id.* at § 178, comment c.

Here, we are dealing with a public policy strongly expressed in the Commodity Exchange Act. This is not "legislation of a minor character." At the time the flexie contracts were signed in 1993, the Commodity Exchange Act provided that entering into an off-exchange futures contract was a felony punishable by a fine of up to $1,000,000 and imprisonment for up to five years. 7 U.S.C. § 13(a)(5). It is true that (a) this conduct was only *malum prohibitum,* and (b) in 1993 the Act did not specif-

ically say that such unlawful contracts were unenforceable. But both points were also true in *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 563, 81 S.Ct. 294, 316, 5 L.Ed.2d 268 (1961), yet the Supreme Court said, "a statute frequently implies that a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment." The Court held that the contract was unenforceable "even though the party seeking enforcement ostensibly appears entirely innocent." 81 S.Ct. at 317.

I turn now to § 178(2) of the Restatement, to see whether there are countervailing interests that tend to favor allowing these three plaintiffs to enforce their flexie contracts.

First. Did "the parties' justified expectations" call for keeping the flexie in force for the ten-year period from April 1994 through March 2004? The answer is no. In January 1994, before the ten-year period even began, MGRM sent letters to these three customers (among others), stating that MGRM understood that the flexies were canceled. (First Am. Cplt. ¶ 85.) These letters would have estopped MGRM from any attempt to enforce those flexies. It is true that the letters were not countersigned by any of these customers, and hence were not instruments of bilateral cancellation. But they were instruments of anticipatory repudiation. During the four months since the signing of the flexie contracts, the market price had not risen. In fact, it had fallen sharply. (Pl. Ex. 20, p. 10.) Hence the anticipatory repudiation did not impose any severe prejudice upon the customers. If they truly wanted an additional long-term supply of product, this was a good time to seek such a commitment from a competitor of MGRM. There is no evidence that any of these three plaintiffs sought any alter-

native supply. And in August 1995, each of these three plaintiffs swore in a declaration that in January 1994 it had agreed with MGRM to cancel its flexie contract (two contracts in the case of Merritt Oil). (MG Ex. 3 at ¶ 8; MG Ex. 4 at ¶ 11; MG Ex. 6 at ¶ 9.) In 1999, MGRM argued that these 1995 sworn statements canceled those particular flexies, even if it were later determined that the flexies were lawful. Judge Kaplan rejected that argument, and said that "the sworn statements themselves are not instruments of cancellation, but merely attest to a prior, apparently unwritten, agreement to cancel." *Cary Oil,* 90 F.Supp.2d at 416–17. I am referring to these 1995 sworn statements to make a different point—now that discovery has been completed, it is clear that the flexie contracts entered into by these three plaintiffs were *unlawful,* and the evidence shows that these three had no justified expectation that they ought to be able to enforce the contracts during the ten years beginning in April 1994.

Second. If enforcement is denied, would this result in any forfeiture as to these three plaintiffs? Again, the answer is no. In connection with these flexie contracts, these three plaintiffs gave no money to MGRM, and there is no evidence that they even acted to their detriment in reliance on the flexies.

It is fair to assume that these three plaintiffs had less knowledge than MGRM had concerning the requirements of the Commodity Exchange Act. Nevertheless, these three plaintiffs were not innocent parties. They knew that their motive was speculation, and they knew that they had no expectation of taking delivery of product under the flexies. Weighing all of the factors set forth in the Restatement, I find no good reason to allow these three plaintiffs to enforce their unlawful ten-year contracts.

This result is entirely consistent with the dictum in *Nagel v. ADM Investor Services, Inc.,* 217 F.3d 436, 439–40 (7th Cir. 2000). Writing for the Seventh Circuit, Judge Posner said (with my emphasis):

> ... [T]he parties assume that futures contracts rendered unlawful by section 6(a) are indeed unenforceable.
>
> We cannot find any case that holds this, although several cases require disgorgement of profits obtained under such unlawful contracts, .... The Supreme Court has stated flatly that "illegal promises will not be enforced in cases controlled by federal law." ... Yet despite this ringing declaration, many cases continue to treat the defense of illegality to the enforcement of a contract as *presumptive rather than absolute,* forgiving minor violations and not allowing the defense to be used to confer windfalls.

The "presumptive" unenforceability of these particular flexies is not overcome by any of plaintiffs' arguments.

The plaintiffs seek to analogize to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), which says, "Every contract made in violation of any provision of this chapter ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract ...." The courts have read this statute "as rendering the contract merely voidable at the option of the innocent party." *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970). Section 29(b) and *Mills* were not cited by Judge Posner in *Nagel,* and I believe there was good reason not to cite them. Most violations of the 1934 Act consist of fraudulent representations, *e.g.,* in the sale of securities or in obtaining proxy votes. The Commodity Exchange

Act is different from the 1934 Act in many ways, but some of its violations also consist of fraudulent sales practices. In such cases it makes sense to analogize to Section 29(b) of the 1934 Act. Judge Kaplan did this is *CFTC v. Hanover Trading Corp.*, 34 F.Supp.2d 203, 206 (S.D.N.Y. 1999), where Hanover sold futures contracts by means of fraudulent representations. By contrast, in the case at bar (as in *Nagel*) there is no claim that the contract was entered into because of any misrepresentations. Hence it would be too glib to talk about an "innocent party," at whose option the contract is voidable.

These three plaintiffs argue that, even if they entered into unlawful contracts, they should be deemed to be innocent parties because they were less familiar with the Commodity Exchange Act than MGRM was. This argument has far-reaching consequences, especially with an executory contract that runs for ten years. Each plaintiff argues that, even though he paid no money in connection with the flexie, and even though MGRM repudiated prior to the contract's start date and again in July 1995, nevertheless he was entitled to wait, watch the market, sue in 1999, and in 2000 demand his "blow-out" cash payment on an unlawful contract.

Plaintiffs' brief (at p. 18, n. 11) cites three CFTC decisions. Two of them were default judgments. *Connolly v. Domestic Oil Corp.*, 1982 WL 30298 (C.F.T.C.); *Matenaer v. Drexel, Ryan & Brown, Inc.*, 1982 WL 30254 (C.F.T.C.). The third has a disclaimer that "the order shall not be binding as a Commission decision i[n] other cases." *Dick v. Jonlyn Investors, Inc.*, 1983 WL 29469 (C.F.T.C.). In each case, the customer was awarded his lost profit on an unlawful, off-exchange commodity option. However, unlike the case at bar, the customer had paid money, and there is no indication that the contract was long-

term (it was four months in *Matenaer*). Moreover, *Connolly* and *Dick* suggest that misrepresentations were made to the customer; they say, in almost identical language, "there is no evidence in the record that complainant was even aware that the transactions were prohibited options, given the misleading characterizations of the transactions by respondent in this proceeding."

Hence there were good reasons for the CFTC to take a different view of the contracts in the case at bar. The CFTC's Consent Order said:

> [T]he Commission ... further finds that the 45 Day Agreements are illegal, and therefore void ....
>
> \* \* \* \* \* \*
>
> ... MGR & M shall certify that it has notified all Purchasers of existing 45 Day Agreements that the Commission has entered this Order finding that the 45 Day Agreements are illegal, and therefore void ....

(MG Ex. 21, pp. 7, 10.)

The plaintiffs assert that the CFTC's Consent Order was unfair, because it voided the flexies but did not void the ratable contracts. But the ratable contracts were different; they involved monthly deliveries of product. The Consent Order's result was consistent with *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). Kelly and Kosuga entered into two agreements. They mutually agreed that neither would deliver any onions to the futures market for the balance of the trading season; this agreement was unlawful under the Sherman Act and hence unenforceable. At the same time, Kelly agreed to purchase a quantity of onions from Kosuga; this was a lawful agreement, and the courts enforced it.

Next, the plaintiffs argue that the flexie contracts are enforceable in view of legisla-

tion enacted on December 21, 2000, more than seven years after the flexies were signed. The Supreme Court has held:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it [the new statute] does not govern absent clear congressional intent favoring such a result.

*Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994).

In December 2000, Congress passed a series of amendments to the Commodity Exchange Act. One amendment created the phrase "eligible contract participant"; its definition lists many alternatives, and the plaintiffs allegedly meet one of them because, they assert, they each had a net worth exceeding $1,000,000 in 1993. 7 U.S.C. § 1a(12)(A)(v)(III). Another amendment inserted a new sub-subsection in the middle of 7 U.S.C. § 25. (It should be noted that the case at bar is not brought under Section 25; it is brought under New York law for breach of contract.) Section 25 now reads in pertinent part as follows:

**§ 25. Private rights of action**

**(a) Actual damages; actionable transactions; exclusive remedy**

\* \* \* \* \* \*

**(4) Contract enforcement between eligible counterparties**

No agreement, contract, or transaction between eligible contract participants ... shall be void, voidable, or unenforceable, ... based solely on the failure of the agreement, contract, transaction, or instrument to comply with the terms or conditions of an exemption or exclusion from any provision of this chapter or regulations of the Commission.

The plaintiffs argue that this new subsubsection (4) applies to the 1993 flexies because, two pages later, Section 25 still contains subsection (d), enacted in 1983:

**(d) Dates of application to actions**

The provisions of this section shall become effective with respect to causes of action accruing on or after the date of enactment of the Futures Trading Act of 1982 [January 11, 1983]: *Provided,* That the enactment of the Futures Trading Act of 1982 shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date.

It seems to me that the first four lines refer only to causes of action created by Section 25 (private rights of action against any person "who violates this chapter"), and hence not to the causes of action in the case at bar. It is unclear why Congress chose Section 25 as the place to insert the new sub-subsection about contract enforcement. Whatever the reason may have been, this insertion does not constitute "clear congressional intent" that the new sub-subsection applies to a contract entered into in 1993 and breached prior to December 2000. Accordingly, plaintiffs'

argument fails to meet the *Landgraf* test. (114 S.Ct. at 1505.)

Moreover, neither RK Distributing, nor Higginson Oil, nor Merritt Oil had a net worth exceeding $1,000,000 in 1993. (See their financial statements, Exh. C to the 11/26/01 Supp. Aff. of Robert Bernstein, Docket Item # 137.) Their recent declarations (Docket Item # 132, Cowden ¶ 5, Higginson ¶ 8, Merritt ¶ 8) seek to throw in the net worth of their affiliates and owners, but those were not parties or guarantors under the contracts in question.

For the reasons stated in this Section 3, RK Distributing, Higginson Oil and Merritt Oil may not enforce their unlawful flexie contracts. I recommend that Judge Marrero grant summary judgment against those three plaintiffs.

### 4. To the Extent that MGRM Breached a Lawful Flexie Contract, Are MGRM'S Parent and Great–Grandparent Nevertheless Entitled to Summary Judgment?

For the purposes of this Section 4, we must assume that the jury will find that: (1) one or more of the plaintiffs saw the flexie contract as a vehicle for taking delivery of product, and (2) said flexie was therefore a lawful contract, and (3) the flexie contract was breached by MGRM. If so, could a reasonable jury find liability against MGRM's parent corporation (MG Corp.) and/or against MGRM's great-grandparent corporation (MGAG)? MG Corp. and MGAG argue that no reasonable jury could make such a finding. I disagree.

Defendants' Memorandum, at page 49, argues as follows:

To begin with, it is well settled that a subsidiary's breach of contract, without more, is legally insufficient to satisfy the "fraud or wrong" prong of New York's veil-piercing standard, even where the parent corporation is responsible for the alleged breach.

This misstates the law. See *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern., Inc.*, 2 F.3d 24, 26–27 (2d Cir.1993), which applied New York law and said:

[W]e conclude that the breach of the franchise agreement that caused CBS to suffer the damages found by the arbitrators was the result of domination and control of CBI by its parent, Diners Club.

The Second Circuit noted that the parent's chairman believed, in good faith, that CBS had breached the contract first. But the majority of the arbitrators later found to the contrary. *Id.* at 28. See also *Simplicity Pattern Co., Inc. v. Miami Tru–Color Off–Set Service, Inc.*, 210 A.D.2d 24, 619 N.Y.S.2d 29 (1st Dep't 1994)(although not a party to the lease, defendant's "domination caused the wrong to plaintiff by stopping payment of rent and breaching the lease").

The Defendants' Memorandum cites, instead, two other cases applying New York law, *Puma Indus. Consulting, Inc. v. Daal Associates, Inc.*, 808 F.2d 982, 986 (2d Cir.1987), and *New York Assoc. for Retarded Children v. Keator*, 199 A.D.2d 921, 606 N.Y.S.2d 784 (3d Dep't 1993). Those two cases talked about piercing the corporate veil in a different context, namely individual owners. As noted in *Keator*, "a business lawfully can be incorporated for the very purpose of enabling its proprietor to escape personal liability," *i.e.*, to shelter his personal assets and keep them separate from his business assets. MG Corp. and MGAG have no personal assets.

I agree with the defendants that there is very little evidence that they "procured" the CFTC Consent Order, or that MG Corp. and MGAG dominated MGRM's negotiations with the CFTC investigators.

On the other hand, there is sufficient evidence for a jury to find that MG Corp. and MGAG forced MGRM to make an anticipatory repudiation of the flexie contracts in January 1994. The Defendants' Memorandum, at page 41, presents only a feeble argument to the contrary. At page 42, it presents its crucial argument:

> Moreover, even if these allegations were probative of MG AG's domination and control of MGRM in late 1993 and early 1994, they are legally insufficient to create a genuine fact dispute with respect to MG AG's alleged domination and control of MGRM's decision to enter the CFTC decree *in July 1995*. The seminal case is *Lowendahl v. Baltimore & Ohio R.R.*, 287 N.Y.S. 62, 247 A.D. 144 (1st Dep't 1936), *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936), where the First Department reversed the lower court's decision to pierce the corporate veil because the alleged evidence supporting piercing was "so remote in time and pertinency"—relating to events 4 to 5 months after the "transaction attacked"—that, as a matter of law, it was non-probative. 287 N.Y.S. at 70, 247 A.D. at 160-61.

Despite reading this, plaintiffs got off to a weak start at page 1 of their Memorandum, writing:

> ... The "transaction" was the July 27, 1995 execution of the CFTC consent decree and the corresponding repudiation of the MGRM flexie contracts.

But at pages 42-43, Plaintiffs' Memorandum essentially says that the "transaction" they are attacking was a year-and-a-half-long campaign from December 1993 to July 1995:

> A mass of additional evidence confirms that MGAG's decision to enter the consent decree was merely the culmination of its year-and-a-half-long campaign directed at "getting rid of the flexie contracts."

That evidence was then set forth at pages 46-50. A reasonable jury could find as follows. In December 1993, MGAG planned to get rid of the flexie contracts, because "those contracts definitely are not good for us." (Nolting Arb. Tr. 1372-73.) MGAG directed the firing of the officers of MGRM, who believed that the flexies were lawful and appropriate. MGAG directed MG Corp. to hire Nancy Kropp Galdy, who promptly unwound all of MGRM's hedges securing the flexie contracts. At her direction, MGRM sent a form letter to its flexie customers purporting "to confirm our agreement" that the flexies were canceled. (Judge Kaplan held that these letters constituted anticipatory repudiation, and that "under the UCC an aggrieved party is free to await performance following an anticipatory repudiation." *Cary Oil*, 90 F.Supp.2d at 411-12.)

Such a jury finding would establish the cause of action stated against MG Corp. and MGAG in the Amended Complaint at Count One (¶¶ 109-13). Count One reads in part:

> 111. On or about July 27, 1995, MGRM breached the Flexie contracts by agreeing to the CFTC Consent Order. By entering into that Consent Order precluding its own performance, MGRM breached its continuing obligation to maintain readiness both to deliver product and to pay the Customers for exercise of their option throughout the term of the Flexie contracts.

> 112. For their participation in and domination and control over the foregoing, MGAG and MG Corp. are also liable to Plaintiffs under *respondeat superior*, piercing the corporate veil and alter ego doctrines.

I read the phrase "control over the foregoing" to include control over the acts de-

scribed in certain of the paragraphs that ¶ 109 incorporates by reference (particularly ¶¶ 61, 70–72 and 85, describing the hedges, their liquidation, and the cancellation letters). Those acts significantly prevented MGRM from maintaining readiness to perform the flexie contracts.

To summarize, I find that, as to each plaintiff, the transaction at issue was the dishonoring of a ten-year contract. The plaintiffs allege that there was a long campaign to get rid of the flexie contracts, including the December 1993 unwinding of the hedges, the January 1994 cancellation letter, the July 1995 Consent Order, and the refusal to make the "blow out" payments demanded by plaintiffs' June 2000 letters (MG Ex. 32). If the jury finds that MGAG and MG Corp. dominated the acts in December 1993 and January 1994, but not the later acts, it may still find that those two corporations are liable for causing damage to any plaintiff whose flexie was lawful. The defendants have produced no authority to the contrary. They cite *Lowendahl,* which is the obverse of the case at bar. In *Lowendahl* the wrong was a fraudulent conveyance to a new corporation; the defendant corporations owned most of the stock of the new corporation, but they did not exercise domination over it until four or five months later. The fraudulent conveyance was the culmination of a plan "conceived and developed by [the new corporation's president] long before [he had] any contact with the defendants or their officers." (247 A.D. at 158, 287 N.Y.S. at 77.) By contrast, in the case at bar, there is evidence that MGAG and MG Corp. conceived and developed a plan to dishonor long-term contracts, and then directed an act of anticipatory repudiation before the time for performance began.

For the reasons stated in this Section 4, I recommend that Judge Marrero rule that MG Corp. and MGAG are not entitled to summary judgment as to any plaintiffs

other than Dalton Petroleum, RK Distributing, Merritt Oil, and Higginson Oil.

### 5. *The Plaintiffs' Expert Witnesses*

Defendants' 10/1/01 Memorandum, at pages 58 through 77, moved to strike most of the opinions offered by plaintiffs' experts. However, the plaintiffs' opposing papers then chose not to rely on those opinions. (11/7/01 Pl. Mem. at 71.) Accordingly, the defendants have requested the Court to defer ruling on those opinions, and have reserved the right to reinstitute this motion if Judge Marrero denies summary judgment in whole or part. (11/26/01 Reply Mem. at 30, n. 36.) I think this request is appropriate. I have considered the summary judgment motion in the framework chosen by the plaintiffs, with no reliance on the opinions of plaintiffs' experts. I recommend that Judge Marrero (a) defer ruling on the plaintiffs' experts, and (b) permit the defendants to reinstitute a motion on this topic at a later date.

### CONCLUSION AND RECOMMENDATION

I recommend that Judge Marrero grant summary judgment against Dalton Petroleum on the ground of release, but deny summary judgment as to any other plaintiffs on that ground.

I recommend that Wise Petroleum not be permitted to sue on its alleged second flexie contract. (See page 20 of this Report)

I recommend that Judge Marrero grant summary judgment against RK Distributing, Merritt Oil, and Higginson Oil on the ground that their flexie contracts were unlawful and unenforceable. I recommend that summary judgment be denied as to the remaining plaintiffs.

I recommend that Judge Marrero rule that MG Corp. and MGAG are not entitled to summary judgment as to any plaintiffs

except Dalton Petroleum, RK Distributing, Merritt Oil, and Higginson Oil.

I recommend that Judge Marrero (a) defer ruling on plaintiffs' expert witnesses, and (b) permit the defendants to re-institute a motion on this topic at a later date.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Victor Marrero, U.S.D.J. at Room 414, 40 Foley Square, New York, N.Y. 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, N.Y. 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988). Any request for an extension of time must be addressed to the District Judge.

Dated: Jan. 4, 2002.

### *ORDER*

MARRERO, District Judge.

In a Decision and Order dated October 23, 2002, the Court granted defendants' motion for summary judgment with respect to four plaintiffs in this action and denied the motion with respect to all other plaintiffs. *See Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,* No. 99 Civ. 1725, 2002 WL 31408894 (S.D.N.Y. Oct. 22, 2002) (the "Decision"). In reaching its Decision, the Court concluded that the contract enforcement provision of the Commodities Futures Modernization Act of 2000 (the "CFMA"),[1] did not apply retroactively to the transactions at issue in this case. By letter dated October 28,

2002, plaintiffs requested leave to file a motion for reconsideration on this particular portion of the Court's Decision. For the reasons discussed below, the Court denies plaintiffs' request.

Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Management Sys. Inc. Secs. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000). Under Local Rule 6.3, which governs motions for reconsideration, the moving party must demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision. *See Lichtenberg v. Besicorp Group Inc.,* 28 Fed.Appx. 73, 2002 WL 109483, *1 (2d Cir. Jan. 25, 2002); *SEC v. Ashbury Capital Partners, L.P.,* No. 00 Civ. 7898, 2001 WL 604044, *1 (S.D.N.Y. May 31, 2001) (citing *AT & T Corp. v. Comty. Network Servs., Inc.,* No. 00 Civ. 316, 2000 WL 1174992, at *1 (S.D.N.Y. Aug. 18, 2000) and Local Rule 6.3).

In the instant case, plaintiffs assert that the Court should reconsider its Decision in light of a decision issued on the same day by the Supreme Court of New York, New York County. *See Louis Dreyfus Energy Corp., et al. v. MG Refining and Marketing, et al.,* Index No. 60053/95 (N.Y. Sup.Ct., N.Y. County October 23, 2002) ("the State Court Decision"). The State Court Decision held that the contract enforcement provision of the CFMA applies retroactively to transactions similar to the transactions at issue in this case. *Id.* at 8–9. While the State Court's ruling on the retroactivity of the CFMA is inconsistent with this Court's ruling on the

1. Pub.L. No. 106–554, 114 Stat. 2763.

same issue, such inconsistency is not a proper basis for this Court to reconsider its Decision. The State Court's interpretation of federal law is clearly not binding on this Court and plaintiffs cite no other controlling law or factual matters that they believe the Court overlooked. *See Lichtenberg*, 2002 WL 109483, at *1. Accordingly, it is hereby

**ORDERED** that Plaintiffs' request for leave to file a motion for reconsideration is DENIED.

**SO ORDERED.**